IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:                                          :
                                                :
KIMMEL'S COAL AND PACKAGING, INC.,      :    Case No. 18-bk-01609 (HWV)
MEADOWBROOK COAL COMPANY, INC.,         :    Case No. 18-bk-02506 (HWV)
MICHAEL COAL COMPANY, INC.,             :    Case No. 18-bk-02507 (HWV)
KIMMEL'S POWER PLANT SERVICES, INC.,    :    Case No. 18-bk-02509 (HWV)
KIMMEL'S MINING COMPANY, INC.           :    Case No. 18-bk-02510 (HWV)
                                                :
                    Debtors-in-Possession:     Jointly Administered under
                                                :    Docket No. 18-1609
FULTON BANK, N.A.,                              :
                                                :    Motion to Compel Compliance with
                    Movants                     :    Sale Order and for Declaratory
                                                :    Relief Regarding Security Interests
              v.                                :    of Fulton Bank, N.A.
                                                :
KIMMEL'S COAL AND PACKAGING, INC.,      :
                                                :
                    Respondents                 :

## OPINION

        This matter came before the Court for hearing on January 29, 2020 (the "Hearing")

regarding the Motion of Fulton Bank, N.A. ("Fulton Bank) to Compel Compliance with Sale

Order and For Declaratory Relief Regarding Security Interests of Fulton Bank, N.A. (the

"Motion To Compel"), and the Objections filed thereto by Commonwealth of Pennsylvania,

Department of Environmental Protection (the "PA DEP") and Rausch Creek Land, L.P.

("Rausch Creek") in the above-referenced bankruptcy cases.  In its Motion to Compel, Fulton

Bank seeks entry of an order: (1)  compelling Rausch Creek to immediately replace certain

letters of credit previously issued by Fulton Bank in connection with two specific mining

permits; (2) enjoining Rausch Creek from operating any business and from mining any coal

under the authority of those permits; (3) enjoining Rausch Creek from utilizing or benefiting

from the letters of credit previously issued by Fulton Bank in connection with those permits; and

1

(4) declaring that Fulton Bank's mortgages, liens, and security interests against certain of the Debtors' assets remain in full force and effect until Rausch Creek replaces the letters of credit as previously described.

## I.      Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). Fulton Bank seeks to enforce this Court's September 4, 2018 sale order which approved the sale of the Debtors' assets free and clear of liens pursuant to § 363(f) of the Bankruptcy Code (the "Sale Order"). Sale Order, ECF No. 168.  A bankruptcy court retains jurisdiction to enforce its orders, *Cox v. Zale Del., Inc.,* 239 F.3d 910, 917 (7th Cir. 2001), and the Sale Order entered by this Court expressly retained such jurisdiction. Sale Order 9, ECF No. 168.  Both a motion to approve a sale of property and a motion seeking to enforce that order are proceedings "arising under title 11" and, therefore, are core proceedings.  28 U.S.C. § 157(b)(1), (b)(2)(N).  This Court therefore has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).

## II.      Facts and Procedural History

The Debtors are Kimmel's Coal and Packaging, Inc. ("Debtor" or "Kimmel's Coal"), Meadowbrook Coal Company, Inc. ("Meadowbrook"), Michael Coal Company, Inc. ("Michael Coal"), Kimmel's Power Plant Services, Inc. ("Kimmel's Power"), and Kimmel's Mining Company, Inc. ("Kimmel's Mining" and collectively with Kimmel's Coal, Meadowbrook, Michael Coal, Kimmel's Power, and Kimmel's Mining, the "Debtors").  An involuntary chapter 7 petition was filed against Kimmel's Coal on April 19, 2018.  On June 5, 2018, the Court converted the Kimmel's Coal case to one under chapter 11.  Meadowbrook, Michael Coal, Kimmel's Power, and Kimmel's Mining each filed voluntary chapter 11 petitions on or around June 12, 2018.  On June 21, 2018, the Court ordered joint administration of the Debtors' cases.

Prior to the bankruptcy filings, the Debtors were engaged in coal mining, coal sales and coal shipping. To legally engage in these activities, the Debtors were obligated under applicable Pennsylvania statutes, including the Surface Mining Conservation and Reclamation Act, Act of May 31, 1945, P.L. 1198, *as amended*, 52 P.S. § 1396.1 *et seq.*[1] (the "Surface Mining Act"), to obtain and hold mining permits.[2] The PA DEP is the agency with the duty and authority to issue the necessary Permits and to enforce operations under the Acts.

Two Permits are relevant here. The first is permit number 54120201 (the "Branchdale Permit") issued by the PA DEP to Michael Coal, as permittee,[3] authorizing slag and coal refuse removal activities[4] on a portion of 173 acres of real property located in Reilly Township, Schuylkill County, Pennsylvania (the "Branchdale Mine"). As permittee, and prior to commencing these slag and coal refuse removal activities at the Branchdale Mine, Michael Coal was required under the Acts to file a bond with the PA DEP for the benefit of the Commonwealth of Pennsylvania.[5] 52 Pa. Stat. Ann. § 1396.4(d). Michael Coal was also required under the Acts to provide the PA DEP with proof of its legal right to enter upon and commence slag and coal refuse removal activities within the Permit area before the Branchdale

---

[1] Other applicable statutes include the Bituminous Mine Subsidence and Land Conservation Act, Act of April 27, 1966, P.L. 31, *as amended*, 52 P.S. § 1406.1 *et seq.* ("Mine Subsidence Act"); The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. § 691.1 *et seq.* ("Clean Streams Law"); Section 1917-A of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 510-17 ("Administrative Code"); and the rules and regulations promulgated thereunder. The Surface Mining Act, Mine Subsidence Act, Clean Streams Law, and Administrative Code shall hereinafter be collectively referred to as the "Acts."

[2] Under the Surface Mining Act, a "permit" is written permission issued by the PA DEP to conduct coal mining activities on a specific tract or tracts of land (hereinafter, a "Permit"). *See,* 52 P.S. § 1396.4; 25 Pa. Code § 86.1.

[3] Under the Surface Mining Act, a "permittee" is defined as the holder of a Permit. *See, e.g.* 52 P.S. § 1396.4.

[4] The Branchdale Permit is a "Bank Removal" or "Coal Refuse Removal" Permit. See ECF No. 455, Page 4; ECF No. 380-1, Page 2. The Acts define "Bank Removal" as "[t]he process of extracting anthracite coal from coal banks which will be disturbed or affected in any manner during [] mining." 25 Pa. Code § 88.1. The Branchdale Permit does not authorize surface mining activities, just coal refuse removal.

[5] The primary purpose of the bond is to secure performance of Michael Coal's obligation to restore the Branchdale Mine to a previous or more natural state once mining activities cease (a process known as "reclamation"). *See* 52 Pa. Stat. Ann. § 1396.4(a)(2)I (West) ("The department shall not approve any post-mining land use unless the application demonstrates that the operation will restore the land affected to a condition capable of supporting the uses it was capable of supporting prior to any mining, or to any higher or better uses").

3

Permit could be issued. 25 Pa. Code § 86.64(a)-(b). The bond requirement was satisfied by an Irrevocable Standby Letter of Credit issued by Fulton Bank on January 29, 2014 on behalf of Michael Coal and in favor of the Commonwealth of Pennsylvania in the original amount of $121,322.00 (the "Branchdale Bond"). DEP Br. Ex. A, at 17, ECF No. 466. The Branchdale Bond was later increased to $141,498.00 by amendment dated May 4, 2014. DEP Br. Ex. A, at 1, ECF No. 466. The Debtors have never owned the land upon which the Branchdale Mine is located. Rather, that land has always been owned by an unrelated non-debtor entity known as the Dale Coal Company. Thus, poof of a legal right to enter upon the Branchdale Mine and conduct slag and coal refuse removal activities was established by submitting to the PA DEP two lease agreements with the Dale Coal Company authorizing same (the "Dale Coal Leases").[6] Michael Coal was the Operator[7] of the Branchdale Mine at the time these cases were filed.

The second Permit is permit number 54890102 (the "White Pine Permit") issued by the PA DEP to White Pine Coal Company, Inc.[8] ( "White Pine"), as permitee, authorizing surface mining activities on a portion of 729.78 acres of real property located in Cass, Foster, and Reilly Townships, Schuylkill County, Pennsylvania (the "White Pine Mine").[9] As is the case with all Permits, White Pine, as permitee, was required under the Acts to file a bond with the PA DEP and to provide proof of its legal right to enter and commence coal mining activities within the Permit area before the White Pine Permit could be issued. 52 Pa. Stat. Ann. § 1396.4(d); 25 Pa.

---

[6] The Debtors did not own the land covered by the Branchdale Permit, though Kimmel's Coal did own the surface and mineral rights in the Permit area. Schedule A/B, ECF No. 117.

[7] Defined under the Surface Mining Act as a "a person or municipality engaged in surface mining as a principal as distinguished from an agent or independent contractor." *See* 52 P.S. § 1396.3 and 25 Pa. Code § 86.1. Operators must obtain a license from the PA DEP before they can proceed to mine coal. 52 Pa. Stat. Ann. § 1396.3a.

[8] White Pine is a non-debtor entity whose most apparent link to these cases is its role as *permitee* of the White Pine Mine Permit. Debtor Kimmel's Coal claims ownership of White Pine Coal Company, Inc., though the basis of this claim is not clear. APA Ex. A, ECF No. 107. Debtor Kimmel's Coal does not disclose any ownership interest in White Pine on its Schedules.

[9] The White Pine Mine is sometimes referred to as the "Baby Boy Jarvis Mine". For the sake of simplicity, this Court will refer to the mine exclusively as the "White Pine Mine".

4

Code § 86.64(a)-(b). The bond requirement was satisfied by a bond originally issued on February 12, 1990 (the "Original White Pine Bond"). The Original White Pine Bond was later replaced with an Irrevocable Standby Letter of Credit issued by Fulton Bank on October 12, 2015 on behalf of Michael Coal, for the benefit of White Pine, and in favor of the Commonwealth of Pennsylvania in the amount of $1,038,528.00 (the "White Pine Bond" and hereinafter collectively referred to with the Branchdale Bond as the "Fulton Letters of Credit"). White Pine did not own all the land upon which the White Pine Mine rests. Much of that land was owned by the Dale Coal Company and was subject to the Dale Coal Leases. Thus, proof of a legal right to enter upon and conduct surface mining activities within the White Pine Permit area was established, at least in part, by submitting the Dale Coal Leases to the PA DEP authorizing same.[10] Michael Coal was the Operator of the White Pine Mine at the time these cases were filed.

Prior to filing these cases, the Debtors suffered significant financial setbacks caused by a slowdown of the coal marketplace and the loss of certain customers. As a result of these circumstances, the Debtors elected to pursue the sale of substantially all their assets in these chapter 11 proceedings. The Debtors thus entered into an Asset Purchase Agreement (the "APA") with Rausch Creek on June 1, 2018 for the sale of substantially all the Debtors' assets (the "Purchased Assets"). As is typical for asset sales in chapter 11, sale of the Purchased Assets to Rausch Creek under the APA was subject to higher and better offers. Thus, on July 6, 2018, and to obtain the authority necessary to sell the Purchased Assets pursuant to the APA, the Debtors filed a Motion to (a) Approve Sale Procedures and (b) for Authority to Sell by Auction

---

[10] It is reported that the Debtors owned some of the land encompassed by the White Pine Permit, and that they owned most of the land upon which surface mining was authorized by the White Pine Permit. Fulton Bank Mem. 3-4, ECF No. 455. However, a portion of the land upon which surface mining was authorized by the White Pine Permit was owned by the Dale Coal Company.

5

Certain Real Property, Personal Property, Vehicles and Leased Equipment Free and Clear of All Liens, Claims, Encumbrances and Other Interests (the "Auction Motion"). The APA was attached to the Auction Motion and made a part thereof, along with its accompanying schedules. Auction Mot. 7, ECF No. 107. The Auction Motion makes it clear that the transaction was "contingent upon, among other things, PA[]DEP transferring certain permits, decrees, orders, consent or agreement for the benefit of Rausch that are acceptable to Rausch, or a Successful Bidder. Rausch or a Successful Bidder has the right to determine which of the Permits it desires to be transferred or assigned." Auction Mot. 8, ECF No. 107.

Limited objections to the Auction Motion were timely filed by Signature Financial, LLC, RR Coal, Inc., and Kinder Morgan Operating, L.P. Limited Objections, ECF Nos. 120, 126, and 127. Each objection was resolved prior to the July 24, 2018 hearing on the Auction Motion. Following the hearing, the Court entered an order granting the Auction Motion with the consent of all parties (the "Auction Order"). Auction Order, ECF No. 152. The Auction Order established August 27, 2018 as the deadline to submit competing bids (the "Bid Deadline") and scheduled a hearing on an anticipated motion to approve auction purchaser pursuant to § 363(f) of the Bankruptcy Code for August 28, 2018 (the "Sale Hearing").

The Bid Deadline passed without the submission of a competing bid and Rausch Creek emerged as the Successful Bidder for the Purchased Assets. Sale Mot. 3-4, ECF No. 163. The Debtors promptly filed the anticipated Motion to Approve Auction Purchaser of Certain Real Property, Personal Property, Vehicles and Leased Equipment Free and Clear of All Liens, Claims, Encumbrances and other Interests and to Approve Distribution (the "Sale Motion"). Sale Mot., ECF No. 163. The Sale Motion proposed sale of the Purchased Assets to Rausch Creek as the Successful Bidder in accordance with the Auction Order. Sale Mot. 4, ECF No. 163.

The Sale Motion was presented to the Court without objection at the Sale Hearing and the Court entered the Sale Order on September 4, 2018. Sale Order, ECF No. 168. It is this Sale Order that Fulton Bank seeks to enforce by the instant Motion to Compel. To that end, the Sale Order contains several provisions that are critical to resolving the matter presently before the Court.

Initially, the Sale Order provides that "[t]he relief requested in the Auction Motion and Sale Motion is granted and approved" and that "[a]ll parties who did not object, or who withdrew their objections, to the Motions are deemed to have consented pursuant to Code Sections 363(f)(2)." Sale Order 2, ECF No. 168. It also provides that "[a]ll transfers of the [Purchased] Assets, and of the Permits as set forth in the Auction Motion and Sale Motion are approved." Sale Order 3, ECF No. 168. Next, the Sale Order clearly indicates that "[t]his Order is deemed to operate as a release of all Liens and Claims as and when the sale of the [Purchased] Assets occurs." Sale Order 6, ECF No. 168. Importantly, the Sale Order provides that "[e]xcept as expressly set forth in the Agreement, Buyer is not expressly or impliedly agreeing to assume any liabilities of the Debtors." Sale Order 6, ECF No. 168. The ensuing language from the Sale Order is also important:

> The terms and conditions of the sale as set forth in Debtors' Sale Motion and in the Court's Order approving Debtors' Motion to Approve Sale Procedures and for Authority to Sell Personal Property Free and Clear of All Liens, Claims Encumbrances and Other Interests are incorporated herein. Closing on the sale must occur as set forth in the Auction Motion and Sale Motion.

Sale Order 7, ECF No. 168.

The next event of consequence occurred on September 30, 2018, when the Dale Coal Company terminated the Dale Coal Leases in accordance with their terms. Mot. for Relief 2, ECF No. 281. Upon termination of these leases, the Debtors (specifically, Michael Coal) no longer possessed a legal right to enter and commence coal mining activities upon the land

7

covered by the Branchdale Permit and a portion of the area covered by the White Pine Permit. This placed Michael Coal out of compliance with the terms of both Permits and with the Acts. On October 12, 2018, Rausch Creek met with the PA DEP to informally review an application it had prepared to transfer the White Pine Permit and a portion of the Branchdale Permit from Michael Coal to Rausch Creek (the "Transfer Application"). Mot. to Compel Hr'g Tr. 130:23-25; 131:1-6; 132:1-12. Rausch Creek did not prepare or submit a separate application for transfer of the Branchdale Permit because it was "entirely part of and consumed within the" Transfer Application. Mot. to Compel Hr'g Tr. 132:13-16. The PA DEP informally rejected the Transfer Application because Rausch Creek could not provide proof of a legal right to enter upon the land encompassed by the Application, much of which was owned by the Dale Coal Company. Mot. to Compel Hr'g Tr. 133:10-13.

After the Transfer Application was informally rejected, Michael Coal engaged in negotiations with the Dale Coal Company to secure a legal right to enter upon the land encompassed by the Transfer Application to conduct coal mining activities. Mot. to Compel Hr'g Tr. 133:18-22. Without this legal right of entry, the Transfer Application could not be approved by the PA DEP. It was also necessary to bring the Debtors into compliance with the existing Permits and with the Acts. These negotiations with the Dale Coal Company were "ongoing" and unresolved as of November 30, 2018, which was the date of closing under the Sale Order and APA ("Closing" or, the "Closing Date"). Mot. to Compel Hr'g Tr. 133:18-19. Thus, Michael Coal was out of compliance with the conditions of the Permits and with the Acts on the Closing Date and the Transfer Application could not be approved by the PA DEP at that time.

Case 1:18-bk-01609-HWV    Doc 485    Filed 06/01/20    Entered 06/01/20 16:32:58    Desc
Main Document      Page 8 of 26

On January 29, 2019, the Dale Coal Company filed a Motion for Relief from the Automatic Stay seeking authority to "proceed to exercise all of its lawful and state court remedies, including but not limited to ejectment" of Michael Coal and any other entity "acting under the auspice of Michael Coal Company". Mot. for Relief 3, ECF No. 28. The Motion for Relief was granted for cause following a hearing on February 26, 2019. Order for Relief, ECF No 333. Shortly thereafter, the Dale Coal Company sent correspondence to the PA DEP advising it that Michael Coal no longer had the legal right to enter and perform slag and coal refuse removal at the Branchdale Mine or coal surface mining activities at the White Pine Mine. As a result, the PA DEP issued two Notices of Violation ("NOV") to Michael Coal on April 17, 2019.

The first NOV was sent to Michael Coal as permittee of the Branchdale Permit (the "Branchdale NOV") and a second one was sent to Michael Coal as permitee of the White Pine Permit (the "White Pine NOV" and collectively with the Branchdale NOV, the "NOVs"). DEP Answer, ECF 380. Both NOVs were "issued under 25 PA Code § 86.64(b) for failure to obtain legal right to enter and conduct coal mining activities." DEP Answer Ex. A., at 2-3, ECF No. 380. The Branchdale NOV continued by stating that "[a]s the entirety of the permit lies on grounds under the ownership of Dale Coal, all mining activities on this permit are to be immediately ceased." DEP Answer Ex. A, at 2, ECF No. 380. Similarly, the White Pine NOV continued by stating that "[a]ll mining activities on grounds under the ownership of Dale Coal are to be immediately ceased." DEP Answer Ex. A., at 3, ECF No. 380. Both NOVs concluded by advising Michael Coal that it must "produce documentation showing [that the] operator has

the legal authority to enter and conduct coal mining activities" or, failing that, it must "commence reclamation activities on the site."[11]

Unable to secure the consent necessary from the Dale Coal Company to formally submit the Transfer Application, Rausch Creek withdrew all its equipment from the land owned by the Dale Coal Company in April or May 2019 without ever formally applying for transfer of the White Pine Permit or the Branchdale Permit.[12] Fulton Mem. 8, ECF No. 455. Instead, Rausch Creek submitted a full application on July 15, 2019 for a new permit covering a diminished area that included only the land purchased by Rausch Creek pursuant to the APA and Sale Order (the "New Permit Application"). Fulton Br. 22, ECF No. 464. According to Rausch Creek, the New Permit Application "included everything [Rausch Creek] owned, and included all of the reclamation liability that existed on those sites, and excluded everything that was owned by Dale Coal." Fulton Br. 22, ECF No. 464. It is unclear from the record whether the New Permit Application was ever approved by the PA DEP.

Fulton Bank filed the instant Motion to Compel on April 17, 2019. In its Motion to Compel, Fulton Bank asserts that the APA and Sale Order required Rausch Creek "to obtain alternative facilities acceptable to [the PA] DEP to secure its obligations under the [Branchdale Permit and the White Pine Permit], after which the Fulton Letters of Credit would be canceled and withdrawn and Fulton would have no further liability or obligation thereunder." Mot. to Compel 3, ECF No. 369. Fulton Bank further asserts that Rausch Creek "is in breach of its obligations under the [APA] and the Sale Order by failing to make a timely application for the

---

[11] Since Rausch Creek was approved as the contract operator under both Permits pursuant to permit corrections issued on March 29, 2019, duplicate NOV's were sent to Rausch Creek (the "Rausch Creek NOV's"). DEP Answer Ex. B, ECF No. 380.

[12] It is undisputed that Rausch Creek never returned is no longer operating under the Permits. Therefore, Fulton Bank's request to enjoin Rausch Creek from (1) operating any business and from mining any coal under the authority of the Permits; and (2) from utilizing or benefiting from the Fulton Letters of Credit; is moot and the Court need not address those requests in this Opinion.

transfer of the Branchdale [] Permit and the White Pine [] Permit and by failing to provide replacement security for the Fulton Letters of Credit."[13] Mot. to Compel 6, ECF No. 369.

Timely Objections to the Motion to Compel were filed by the PA DEP and by Rausch Creek on April 30, 2019 and May 1, 2019. ECF Nos. 380 and 381. In its objection to the Motion to Compel, the PA DEP advises that it "cannot approve replacement letters of credit or other financial security" until the Permits are transferred to Rausch Creek and that such transfer is not possible "[u]nless Rausch Creek produces a lease or another document showing that it has authority to enter the property and conduct mining activities at the Branchdale [] Mine and the White Pine [] Mine." DEP Answer 3, ECF No. 380 (citing 25 Pa. Code § 86.166 and 25 Pa. Code § 86.64). The PA DEP also attached copies of the NOV's. Rausch Creek's reply to the Motion flatly denies Fulton Bank's assertion that the APA or the Sale Order "created any obligations for Rausch Creek to replace any letters of credit" until after the Permits are transferred to Rausch Creek. Rausch Creek Answer 2, ECF No. 381. According to Rausch Creek, it merely "purchased the right to seek" transfer of the Permits (subject to approval by the PA DEP) and that it "never agreed to be responsible for any letters of credit that remain in place after Rausch Creek is through with the transfer process with the PA DEP." Rausch Creek Answer 5, ECF No. 381. Rausch Creek also acknowledges in its reply that it "has been unable to attain access on the Dale Coal property and so is not" conducting mining activities at the Branchdale or White Pine Mines. Rausch Creek Answer 6, ECF No. 381.

---

[13] As previously observed, the Motion to Compel also seeks an order declaring that Fulton Bank's mortgages, liens, and security interests against certain of the Debtors' assets remain in full force and effect until Rausch Creek replaces the Fulton Letters of Credit. The Sale Order expressly states, however, that "[t]his Order is deemed to operate as a release of all Liens and Claims as and when the sale of the [Purchased] Assets occurs." Sale Order 6, ECF No. 168. The Sale Order was not timely appealed, however, and Fulton Bank has offered no legal argument or authority for their request to reimpose the Liens and Claims. The Court therefore considers this request abandoned by Fulton Bank.

11

A hearing on the Motion and the responses thereto was held on January 29, 2020 where testimony was taken, and exhibits were entered into the record. Briefs were submitted by all parties and additional arguments were heard on April 7, 2020. The matter is now ripe for a decision.

### III. Discussion

As a threshold matter, the Court notes that the Sale Order and its incorporated terms of sale must be construed according to general principles of contract law. *In re Oyster Bay Cove, Ltd.*, 161 B.R. 338, 343 (Bankr. E.D.N.Y. 1993), aff'd, 196 B.R. 251 (E.D.N.Y. 1996) (citing *United States v. ITT Cont'l Baking Co.,* 420 U.S. 223, 238 (1975)). This is so because unopposed sale orders of this kind are analogous to consent orders—and it is well established that consent orders are construed largely as contracts.[14] Unopposed sale orders, therefore, like consent decrees, are hybrid legal documents in that they are at once both contracts and orders; they are construed largely as contracts but are enforced as orders. *Berger v. Heckler*, 771 F.2d 1556, 1567–68 (2d Cir. 1985); *see also ITT Cont'l Baking Co.,* 420 U.S. at 236 n. 10.

The impact of these observations is significant. It allows the Court to conclude that unopposed sale orders that provide for sale of property at a price less than the aggregate value of all liens on such property should be construed as a contract and not as a decree. Such an order

---

[14] Unopposed sale orders of this kind are analogous to consent orders because, like consent orders, they represent a compromise where each of the affected parties give up something they might have won in litigation had they pursued it, and they each waive their rights to that litigation by allowing the sale order to be entered. *See ITT Cont'l Baking Co.*, 420 U.S. at 233. Consider also that parties affected by an unopposed sale order are deemed to have "consented to" its precise terms and conditions, as was expressly the case here. *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) (*citing In re Tabone, Inc.,* 175 B.R. 855, 858 (Bankr.D.N.J.1994); *In re Elliot,* 94 B.R. 343, 345–46 (Bankr.E.D.Pa.1988)); *see also In re Szostek,* 886 F.2d 1405, 1409 (3d Cir.1989) . Finally, like parties to a consent order, the parties affected by entry of an unopposed sale order often have purposes generally at odds with one another, and the resultant sale order embodies as much of those divergent purposes as the respective parties have the bargaining power and skill to achieve. *See ITT Cont'l Baking Co*., 420 U.S. at 236*; See also U.S. v. Armour & Co.,* 402 U.S. 673, 681–682 (1971).

12

must therefore be construed as written, and not as they might have been written had the debtor, the buyer, or any other affected party established their respective factual claims and legal theories in litigation prior to its entry. *ITT Cont'l Baking Co.*, 420 U.S. at 236; *see also Armour*, 402 U.S., at 681–82; *McDowell v. Philadelphia Hous. Auth. (PHA)*, 423 F.3d 233, 239 (3d Cir. 2005). Also, because the parties' property interests in assets of the bankruptcy estate are at issue, this Court will apply state law when construing the Sale Order. The Supreme Court has long held that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S. 48, 54 (1979).

With the above framework in mind, the court now turns to the central question presented, which is whether Rausch Creek assumed liability for reclamation of the land associated with the Branchdale Permit and the White Pine Permit pursuant to the Sale Order or its incorporated terms of sale, including the APA. There are two parts to this question. The first is whether this liability was conveyed to Rausch Creek at Closing by the APA. If it was, then Rausch Creek is liable for reclamation of the land and the Motion of Fulton Bank may be granted, at least in part. If this liability was not conveyed to Rausch Creek by the APA, then the second question is whether the Sale Order or any of its incorporated terms of sale modified the APA and conveyed this liability to Rausch Creek as Fulton Bank suggests. If it did, then Rausch Creek is liable for reclamation of the land associated with the Permits and the Motion of Fulton Bank may be granted. Otherwise, the Motion will be denied.

A.      **The APA**

Rausch Creek did not assume liability at Closing for reclamation of the land associated with the Branchdale Permit or the White Pine Permit pursuant to the terms of the APA. Nor did the APA require Rausch Creek to obtain alternative facilities acceptable to the PA DEP to secure

13

any obligation under the Permits after which the Fulton Letters of Credit would be canceled and withdrawn and Fulton would have no further liability or obligation thereunder. This is so because the Debtors' rights, title and interests in, to and under the Permits, including liability for reclamation, cannot be sold, transferred, assigned, conveyed or delivered separate from the Permits, and the Permits were not sold, transferred, assigned, conveyed or delivered to Rausch Creek under the APA.

### 1.      Permit Rights not Severable from Permit Under State Law

It cannot be disputed that under Pennsylvania law, a "transfer, assignment or sale of the rights granted under a permit may not be made except that . . . [p]ermits may be reissued in a new name provided that no change of ownership is involved [or] . . . [t]he [PA DEP] may allow a permittee to transfer a permit to another operator if the successor operator . . . submit[s] and entirely new application" or a transfer "application which incorporates the original application submittals." 25 Pa. Code § 86.56.

It is given that the Permits at issue here were not reissued in the name of Rausch Creek as the Debtors and Rausch Creek do not have common ownership. Sale Order 5, ECF No. 168. It is also uncontested that Rausch Creek did not submit an entirely new application regarding the Permits prior to the Closing Date. Thus, the only lawful way for the Debtors to have sold, transferred, assigned, conveyed or delivered their right, title and interest in, to and under either Permit pursuant to the APA at Closing, including their liability for reclamation,[15] is to have

---

[15] The sale, transfer, assignment, conveyance or delivery of the Debtors' liability for reclamation under either Permit is likewise restricted by the Acts. *See* 25 Pa. Code §§ 86.175; 86.172; 86.167. ("The Department will not release any portion of the liability under bonds applicable to a permit area" until it is "satisfied that the entire permit area or portion of a permit area has been reclaimed to the standards" set forth in the Acts, or, alternatively, that a "successor operator . . . post[s] a new bond in an appropriate amount . .  assuming all accrued liability for the permit area.").

14

secured the approval of the PA DEP to transfer the Permits to Rausch Creek as a new operator. The Court will therefore focus its state contract law analysis of the APA on this condition.

### 2.     The Plain Meaning of the APA

It is well settled under Pennsylvania law that the "paramount goal of contract interpretation is to determine the intent of the parties." *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (quoting *Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc.*, 273 F.3d 332, 335 (3d Cir. 2001)). It is equally resolved that Pennsylvania contract law begins with the firmly settled principle that "the intent of the parties to a written contract is contained in the writing itself." *Krizovensky v. Krizovensky,* 624 A.2d 638, 642 (Pa. Super. Ct. 1993) (citing *Steuart v. McChesney,* 444 A.2d 659, 661 (Pa. 1982)). Where the words are clear and unambiguous, the intent of the parties must be determined from "the express language of the agreement" and there is no need to resort to extrinsic aids or evidence. *Steuart*, 444 A.2d at 661. Indeed, "the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." *Steuart,* 444 A.2d at 661. A contractual provision is ambiguous under Pennsylvania law only where the disputed language "is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one." *Samuel Rappaport Family Partnership v. Meridian Bank*, 657 A.2d 17, 21–22 (Pa. Super. Ct. 1995) (quoting *Z & L Lumber Co. of Atlasburg v. Nordquist*, 502 A.2d 697, 700 (Pa. Super. Ct. 1985)). A writing is also ambiguous when it is "obscure in meaning through indefiniteness of expression or has a double meaning." *Samuel Rappaport Family Partnership*, 657 A.2d at 21 (quoting *Z & L Lumber Co.*, 502 A.2d at 700).

As a preliminary matter, therefore, courts interpreting a writing must determine which category it falls into—clear or ambiguous. *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*,

40 F.3d 1416, 1424 (3d Cir. 1994). The Supreme Court of Pennsylvania has identified two kinds of ambiguity: (1) patent ambiguity; and (2) latent ambiguity. The former appears on the face of the writing and "arises from the defective, obscure, or insensible language used" while the latter arises from "extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." *Allegheny* 40 F.3d at 1424. (quoting *Steuart,* 444 A.2d at 663) (internal quotations omitted).

### i.     The Purchased Assets Under Paragraph 2.1(c)

With the above framework in mind, the Court now turns to Paragraph 2.1 of the APA. The language found here describes the only terms and conditions under which the Permits or the liabilities associated therewith could have been sold, transferred, assigned, conveyed or otherwise delivered to Rausch Creek at Closing under the APA, if at all. If the Court finds that the Permits or their attendant liabilities were sold, transferred, assigned, conveyed or otherwise delivered to Rausch Creek as part of the "Purchased Assets" at Closing, then Rausch Creek is liable for reclamation of the land pursuant to the APA. If liability was not sold, transferred, assigned, conveyed or otherwise delivered to Rausch Creek as part of the "Purchased Assets" at Closing, then Rausch Creek is not liable for reclamation of the land pursuant to the APA and the Court will proceed with its analysis of the terms and conditions of the Sale Order.

The definition of the term "Purchased Assets" under the APA includes all "Real Property Purchased Assets." Auction Mot. Ex. A, ECF No. 107. The term "Real Property Purchased Assets" in turn, includes the following:

> 2.1 <u>Real Property Purchased Assets</u>. Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase from Sellers, free and clear of all Encumbrances (except Permitted Encumbrances), all right, title and interest of Sellers in, to and under the following assets primarily used in or related to the ownership and operation of the Businesses (other than Excluded Assets), real,

16

personal, or mixed tangible and intangible, of every kind, nature and description, wherever located, as the same shall exist on the Closing Date (collectively, the "**Real Property Purchased Assets**"):

\* \* \* \*

   (c) To the extent transferrable to Buyer, all Permits, licenses, existing bonding, orders, approvals and other authorizations of any Governmental Body owned, held or used by Sellers, in or related to the ownership of the Real Property or operation of the Businesses.

Auction Mot. Ex. A, at 7 ECF No. 107. It is undisputed that the meaning of "Permits" as that term is used in the APA includes the Branchdale Permit and the White Pine Permit.[16] It is also undisputed that the Branchdale Permit and White Pine Permit are not included in the definition of "Excluded Assets." Auction Mot. Ex. A, at 8-9, ECF No. 107. The "Real Property" referenced in paragraph 2.1 of the APA includes the mineral rights associated with the Branchdale Mine but does not include all land related to the White Pine Mine. Auction Mot. Ex. A at 2, ECF No. 107. The term "Businesses" is defined elsewhere in the APA as "the business of mining, processing, drying, marketing, selling and distributing coal, coal silt, waste coal, scrap steel and related activities." Auction Mot. Ex. A., at 2, ECF No. 107. With these clarifications, the Court detects no language in the above provisions that could be reasonably susceptible of different constructions or that is capable of being understood in more than one sense. Nor are there any extraneous or collateral facts in this case which make the meaning of the provision uncertain even though its language is clear and unambiguous. Because of this, the intent of the parties can clearly be determined from the express language of the provision itself and there is no need to resort to extrinsic aids or evidence.

---

[16] Section 5.11 of the APA, captioned "Compliance With Law; Permits" defines "Permits" as "all material licenses, franchises, permits, registrations, approvals and other authorizations or waivers from a Governmental Body that are necessary to entitle Sellers to own or lease, and operate and use the Purchased Assets and to carry on the Businesses as currently conducted, including, without limitations, all mining permits and/or mining Contracts with respect to mining operations at the Real Property (collectively, the 'Permits')." Auction Mot. Ex. A, at 19, ECF No. 107.

17

According to the plain language of the controlling provision above, the Debtors agreed to transfer the Permits to Rausch Creek at Closing, but only to the extent the Permits were "transferable" to Rausch Creek as they existed at that time.[17] It is not disputed that the Permits, if transferred to a new permittee, include an obligation under the Acts for reclamation of the land associated therewith. 52 Pa. Stat. Ann. § 1396.4(d). Accordingly, to establish a basis for their Motion to Compel under the APA, Fulton Bank need only prove that the Permits, as they existed on the Closing Date, were transferred to Rausch Creek at Closing, or were at least "transferable" to Rausch Creek at that time. The Court has little difficulty determining that they were not.

The language controlling whether the Permits were "transferable" at Closing is found in the first sentence of Paragraph Fifteen of the APA, which reads as follows:

> The Permits may only be transferred, as opposed to being assumed and assigned, by the Debtors to a third party subject to approval by the Pennsylvania PA[]DEPartment of Environmental Protection ("PADEP").

Auction Mot. Ex. A, at 5, ECF No. 107. This language is clear. To establish that the Permits as they existed on the Closing Date were transferable for purposes of Paragraph 2.1 of the APA, Fulton Bank must prove that such transfer was approved, or was at least approvable, by the PA DEP at that time.

No one has asserted that transfer of the Permits was approved by the PA DEP at Closing. Indeed, review of the record demonstrates that not only was transfer of the Permits not approved by the PA DEP at Closing, such approval would not have been lawful under the Acts at that time. Recall that a party applying for a permit or for transfer of a permit must possess the "legal right

---

[17] It has already been established that the rights granted under a permit may not be separately sold, assigned, conveyed or delivered to another, except through a transfer of the actual permit by application approved by the PA DEP. 25 Pa. Code § 86.56. Thus, the language of Paragraph 2.1 of the APA can only be interpreted as providing for transfer of the Permits rather than a sale, assignment, conveyance or other delivery of the Debtors' right, title or other interest under same.

to enter and commence coal mining activities within the permit area" before the permit can be issued or transferred under the Acts. 25 Pa. Code § 86.64(a)-(b). It is undisputed that the Debtors' legal right to enter the land covered by the Permits was dependent upon the Dale Coal Leases, both of which were terminated prior to the Closing Date. It is equally clear that Rausch Creek was unable to subsequently secure the required legal right of entry in connection with the Transfer Application prior to Closing. As a result, neither the Debtors or Rausch Creek possessed a legal right to enter and commence coal mining activities within the Permit areas on the Closing Date. Thus, not only was transfer of the Permits not approved by the PA DEP at Closing, such approval would not have been lawful under the Acts at that time. Accordingly, the Court has little difficulty finding that the Permits as they existed on the Closing Date were not transferred and were not "transferrable" to Rausch Creek at Closing under Paragraph 2.1(c) of the APA.

Based upon these findings, the Court concludes that the Permits and their attendant rights, title, and interests, including liability for reclamation of the land, were not sold, transferred, assigned, conveyed or otherwise delivered to Rausch Creek at Closing as part of the "Purchased Assets" under Paragraph 2.1 of the APA. Since there are no other provisions of the APA that may have conveyed such interests or liability, the Court concludes that Rausch Creek did not assume liability at Closing for reclamation of the land associated with the Branchdale Permit or the White Pine Permit pursuant to the terms of the APA. Nor did the APA require Rausch Creek to obtain alternative facilities acceptable to the PA DEP to secure any obligation under the Permits after which the Fulton Letters of Credit would be canceled and withdrawn and Fulton would have no further liability or obligation thereunder.

19

The Court will now turn to the second issue presented. That is, whether Rausch Creek assumed liability at Closing for reclamation of the land associated with the Branchdale Permit and the White Pine Permit pursuant to the Sale Order or any of its incorporated terms of sale.

### B.    The Meaning of the Sale Order

Rausch Creek did not assume liability at Closing for reclamation of the land associated with the Branchdale Permit or the White Pine Permit pursuant to the terms of the Sale Order or any of its incorporated terms of sale. Nor did the Sale Order require Rausch Creek to obtain alternative facilities acceptable to the PA DEP to secure any obligation under the Permits after which the Fulton Letters of Credit would be canceled and withdrawn and Fulton would have no further liability or obligation thereunder. This is so because the language relied upon by Fulton Bank to impose such liability in connection with the Permits applies only "upon successful transfer of the Permits," and the Permits have never been successfully transferred.

Fulton Bank chiefly relies upon the following language contained in paragraph 48 of the Auction Motion for its position:

> All Letters of Credit or bonds needed for the permits which are to be transferred, assumed or replaced by the Successful Bidder that the Successful Bidder accepts transfer of in connection with the purchase of the Assets are to be provided by the Successful Bidder. The Successful Bidder understands that it will need to provide its own financial guarantee to PADEP upon successful transfer of the Permits.

Auction Mot. 13, ECF No. 107. As with the language previously cited from the APA, this Court detects no language in the above provision that could be reasonably susceptible of different constructions or that is capable of being understood in more than one sense. Nor are there any extraneous or collateral facts in this case which make the meaning of the provision uncertain even though its language is clear and unambiguous. Because of this, the intent of the parties, to

the extent applicable here, can clearly be determined from the express language of the provision itself and there is no need to resort to extrinsic aids or evidence.

According to the plain language of the provision above, Fulton Bank must prove several legal issues to establish a basis for their Motion to Compel under the Sale Order and incorporated terms of sale. First, it must prove that the "Letters of Credit or bonds needed for the permits" includes the Fulton Bank Letters of Credit. Second it must establish that the "permits which are to be transferred, assumed or replaced" include the Branchdale Permit and the White Pine Permit. Third, it must show that the "Successful Bidder" was Rausch Creek and that Rausch Creek accepted the "successful transfer of the Permits . . . in connection with the purchase of the Assets." It is undisputed that the referenced "letters of Credit or bonds needed for the permits" includes the Fulton Bank Letters of Credit and that the "permits which are to be transferred, assumed or replaced" include the Branchdale Permit and the White Pine Permit. It is also acknowledged that Rausch Creek was the "Successful Bidder" for purposes of the above provision. Accordingly, the only issue that requires examination here is whether Rausch Creek accepted the "successful transfer of the Permits . . . in connection with the purchase of the Assets."

It has already been established that that the Permits were not transferred to Rausch Creek at Closing. Thus, for Fulton Bank to succeed on this claim here, it must establish that Rausch Creek accepted the successful transfer of the Permits sometime after the Closing Date. Unfortunately for Fulton Bank, the record in this matter establishes that it did not. Recall that after Rausch Creek was unable to secure the consent necessary from the Dale Coal Company to enter and commence coal mining activities upon the Branchdale and White Pine Mines, Rausch Creek withdrew all its equipment from the land owned by the Dale Coal Company without ever

Case 1:18-bk-01609-HWV    Doc 485    Filed 06/01/20    Entered 06/01/20 16:32:58    Desc
Main Document    Page 21 of 26

formally applying for transfer of the Permits. Fulton Mem. 8, ECF No. 455. Instead, Rausch

Creek submitted the New Permit Application on July 15, 2019 seeking a different permit

covering a diminished area that included only the land purchased by Rausch Creek pursuant to

the APA and Sale Order. Fulton Br. 22, ECF No. 464. This New Permit Application "included

everything [Rausch Creek] owned, and included all of the reclamation liability that existed on

those sites, and excluded everything that was owned by Dale Coal." Fulton Br. 22, ECF No.

464. It is unclear from the record whether the New Permit Application was ever approved by the

PA DEP, though it seems likely that it was. What is clear from the record, however, is that there

is no evidence demonstrating that Rausch Creek ever formally submitted an application seeking

transfer of the Permits or that it ever accepted the "successful transfer of the Permits . . . in

connection with the purchase of the Assets." Indeed, review of the record establishes that no

such successful transfer is even alleged to have occurred.

  In view of the foregoing, the Court has little difficulty finding that Rausch Creek never

accepted the successful transfer of the Permits in connection with the purchase of the Debtors'

assets under Sale Order or any of its incorporated terms of sale. Based upon this finding, the

Court concludes that Rausch Creek did not assume liability at any time for reclamation of the

land associated with the Branchdale Permit or the White Pine Permit pursuant to the terms of the

Sale Order or any of its incorporated terms of sale. This is so because the language relied upon

by Fulton Bank to impose such liability in connection with the Permits applies only "upon

successful transfer of the Permits," and the Permits have never been successfully transferred.

###   C.  Did Rausch Creek Improperly "Utilize" the Fulton Letters of Credit?

  Fulton Bank advances one final argument that requires discussion, though it cannot be

resolved here. Fulton Bank argues that the first sentence of Paragraph 48 of the Auction Motion

"unequivocally establishes that the letters of credit issued by Fulton Bank were not to be . . . utilized by Rausch Creek" and that Rausch Creek violated this prohibition when it conducted mining activities as a contract operator under the Permits beginning immediately after the entry of the Sale Order through approximately April 2019. Fulton Br. 20-21, ECF No. 464. A portion of the relevant language found in Paragraph 48 of the Auction Motion reads as follows:

> All letters of credit posted or provided by the Debtors as to the Permits and for the use of any of the Assets (the "Letters of Credit") may not be assigned to or utilized by the Successful Bidder.

Auction Mot. 13, ECF No. 107.

It has not yet been challenged that the "Letters of Credit" referenced here include the Fulton Letters of Credit and that the reference to "Permits" includes the Branchdale Permit and the White Pine Permit. It is also unchallenged to date that Rausch Creek was the Successful Bidder or that the plain meaning of the above language prohibits the Fulton Letters of Credit from being assigned to or utilized by Rausch Creek. Accordingly, as it presently stands, to establish its position as stated above, Fulton Bank need only prove that Rausch Creek engaged in activity that improperly assigned or utilized the Fulton Letters of Credit in violation of this language. If Fulton Bank can establish such a violation, then it may be entitled to recover whatever damages it suffered as a result. Such damages would be limited to the kind that (1) would naturally and ordinarily result from the violation or, (2) were within the contemplation of the parties at the time the Sale Order was entered, and (3) can be proven with reasonable certainty. *See Ferrer v. Trustees of Univ. of Pennsylvania*, 573 Pa. 310, 341 (2002) (citing *Taylor v. Kaufhold,* 368 Pa. 538 (1951) (citations and emphasis omitted)). Such a remedy is consistent with the equitable goal of putting Fulton Bank in as good a position as it would have been had the Sale Order been complied with, that is, had there been no violation.

This issue cannot be resolved here as the record has not been closed on this or the

companion issue regarding the nature and extent of the rights and privileges afforded to Rausch

Creek under Paragraph 8.6 of the APA.   Some testimony has been taken on these issues, though

the record remains open and the matter is thus not ripe for decision.  Further discussion of this

issue is deferred until the appropriate time.

### D.    Fulton Bank's Remaining Arguments

Fulton Bank likely disagrees with the Court's analysis above.  It has argued that pursuant

to paragraph 48 of the Auction Motion, and for each mining permit Rausch Creek chose to

accept, "Rausch Creek was obligated to obtain alternative credit facilities acceptable to [PA]

DEP to secure the reclamation obligations under the mining permits.  Thereafter, the Fulton

Bank letters of credit would be canceled and withdrawn and Fulton Bank would have no further

liability or obligation thereunder."  Fulton Br. 42, ECF No. 464.  Fulton Bank has also argued

that "[b]y the terms of its conduct, by the terms of the [APA], and by operation of applicable

Pennsylvania law, Rausch Creek assumed the risk that it would not be able to obtain transfer of

the White Pine permit" and that Rausch Creek is therefore "responsible for the reclamation

liabilities which attached to the White Pine permit, notwithstanding the fact that Rausch Creek

has not yet been able to obtain transfer of the White Pine permit." Fulton Br. 42, ECF No. 464.

This assumption of the risk of reclamation, argues Fulton Bank, "was a necessary and essential

element of the consideration Fulton Bank bargained for, and is entitled to receive, pursuant to

agreement between Fulton Bank and Rausch Creek memorialized in the Motion and Orders."

Fulton Br. 42, ECF No. 464.

The rationale advanced by Fulton Bank in support of these arguments is not persuasive.

To the contrary, the rationale offered at its core amounts to nothing more than an unsupported

declaration that the Debtors' somehow sold, transferred, assigned, conveyed or delivered their right, title and interest in, to and under both Permits, including liability for reclamation of the land, to Rausch Creek separate and apart from the transfer of the Permits. As set forth at length above, however, this declaration is not well founded under the law or the facts of this case. Indeed, aside from the language directly addressed by the Court's analysis above, Fulton Bank does not identify any legal or factual basis for this otherwise self-serving and conclusory assertion. The Court is therefore unpersuaded by Fulton Bank's arguments and the Motion to Compel on these grounds will be denied.

Before concluding, the Court also notes that it is clear from the pleadings, briefs, testimony, and other evidence that Fulton Bank may not have anticipated the above findings of fact and conclusions of law. Perhaps it silently believed that the Debtors' right, title and interest in, to and under both Permits, including liability for reclamation of the land, could be conveyed to Rausch Creek separate and apart from transfer of the Permits. Perhaps it quietly thought that liability for reclamation of the land was assumed by Rausch Creek the moment it identified which of the Permits it desired to be transferred to it. Exactly what was thought by Fulton Bank, however, is not relevant here because the Court finds the law and the applicable language of the APA and Sale Order to be clear and unambiguous. Indeed, because the language is clear and unambiguous, the focus of interpretation must be upon the terms of the APA and Sale Order as manifestly expressed, rather than as, perhaps, silently believed by Fulton Bank.

## IV. Conclusion

This Court concludes that Rausch Creek did not assume liability for reclamation of the land associated with the Branchdale Permit and the White Pine Permit pursuant to the Sale Order or its incorporated terms of sale, including the APA. This is so because the Debtors' right, title

25

and interest in, to and under the Permits, including liability for reclamation, cannot be sold, transferred, assigned, conveyed or delivered separate from the Permits, and the Permits were not sold, transferred, assigned, conveyed or delivered to Rausch Creek under the APA. Moreover, the Sale Order language relied upon by Fulton Bank to impose such liability in connection with the Permits applies only "upon successful transfer of the Permits," and the Permits in question have never been successfully transferred. In the absence of a finding that the Permits and their attendant rights, title and interests were transferred to Rausch Creek as part of the APA or the Sale Order, the remainder of Fulton Bank's arguments regarding Rausch Creek's assumption of liability for reclamation of the land must fail. The Court does not decide the remaining issue of whether Rausch Creek engaged in activity that improperly assigned or utilized the Fulton Letters of Credit in violation of language in the first sentence of Paragraph 48 of the Auction Motion. The record remains open on this issue and the matter is therefore not yet ripe for a decision.

The Motion to Compel is denied to the extent that it seeks an order determining that Rausch Creek assumed liability for reclamation of the land associated with the Branchdale Permit and the White Pine Permit pursuant to the Sale Order or its incorporated terms of sale, including the APA. Additional hearings as necessary to close the record on the issue of whether Rausch Creek engaged in activity that improperly assigned or utilized the Fulton Letters of Credit in violation of language found in the first sentence of Paragraph 48 of the Auction Motion may be scheduled following consultation with the parties at the next scheduled hearing in this matter.

An appropriate order will follow.

Dated: June 1, 2020

By the Court,

Henry W. Van Eck, Chief Bankruptcy Judge (JH)