IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:                                          :
                                                :
KIMMEL'S COAL AND PACKAGING, INC.,     :   Case No. 18-bk-01609 (HWV)
MEADOWBROOK COAL COMPANY, INC.,        :   Case No. 18-bk-02506 (HWV)
MICHAEL COAL COMPANY, INC.,            :   Case No. 18-bk-02507 (HWV)
KIMMEL'S POWER PLANT SERVICES, INC.,   :   Case No. 18-bk-02509 (HWV)
KIMMEL'S MINING COMPANY, INC.          :   Case No. 18-bk-02510 (HWV)
                                                :
                        Debtors-in-Possession  :   Jointly Administered under
                                                :   Docket No. 18-1609
FULTON BANK, N.A.,                              :
                                                :   Motion to Compel Compliance with
                        Movants                  :   Sale Order and for Declaratory
                                                :   Relief Regarding Security Interests
                   v.                           :   of Fulton Bank, N.A.
                                                :
KIMMEL'S COAL AND PACKAGING, INC.,     :
                                                :
                        Respondents             :

## OPINION

   In this case the Court considers the Motion of Fulton Bank, N.A. ("Fulton Bank") to

Compel Compliance with Sale Order and For Declaratory Relief Regarding Security Interests of

Fulton Bank, N.A. (the "Motion to Compel") and its Motion for Order of Contempt Against

Rausch Creek, L.P. (the "Motion for Contempt"). In its Motion to Compel, Fulton Bank seeks

entry of an order: (1) compelling Rausch Creek, L.P. ("Rausch Creek") to prepare and submit

applications to the Commonwealth of Pennsylvania, Department of Environmental Protection

(the "PA DEP") to obtain the permits necessary to operate all mining operations at certain real

property that it purchased from the Debtors on November 30, 2018; and (2) to assume all

liability for reclamation[1] of that real property as part of that process.  In its Motion for Contempt,

---

[1] Under Pennsylvania law, "reclamation" is the process of restoring real property to a previous or more natural state once mining activities cease. *See* 52 PA. CONS. STAT. § 1396.4(a)(2).

Fulton Bank also seeks an order determining that Rausch Creek is in civil contempt of a July 9, 2019 Order approving a Stipulation for Entry of Consent Order previously entered by and between Fulton Bank and Rausch Creek as partial resolution of the Motion to Compel. For the following reasons, the Motion to Compel is granted in part, the Motion for Contempt is denied, and the request for damages is denied without prejudice.[2]

## I.      Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). Fulton Bank seeks to enforce this Court's September 4, 2018 Order which approved the sale of the Debtors' assets free and clear of liens pursuant to § 363(f) of the Bankruptcy Code. Sale Order, ECF No. 168.  A bankruptcy court retains jurisdiction to enforce its orders, *Cox v. Zale Del., Inc.,* 239 F.3d 910, 917 (7th Cir. 2001), and the September 4, 2018 Order entered by this Court expressly retained such jurisdiction. Sale Order 9, ECF No. 168.  Both a motion to approve a sale of property and a motion seeking to enforce that order are proceedings "arising under title 11" and are therefore core proceedings.  28 U.S.C. § 157(b)(1), (b)(2)(N).  Accordingly, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).

## II.     Facts and Procedural History

This matter is related to the Court's prior decision in *In re Kimmel's Coal & Packaging, Inc.*, No. 18-1609, 2020 WL 5576960 (Bankr. M.D. Pa. June 1, 2020),[3] familiarity with which is presumed. Debtors were engaged in coal mining, coal sales and coal shipping pursuant to several permits issued by the PA DEP.  Two of those permits are relevant to the instant proceedings.

---

[2] The request for damages does not appear in either the Motion to Compel or the Motion for Contempt.  Rather it was raised for the first time in one of the Briefs later submitted by Fulton Bank.
[3] Hereinafter referred to as the "Prior Opinion."

2

The first permit is the "Branchdale Permit." The Debtors have never owned the land encompassed by the Branchdale Permit (hereinafter referred to as the "Branchdale Mine"). Rather, that land has always been owned by an unrelated non-debtor entity known as the Dale Coal Company. Because of this, the Debtors' legal right to enter upon the Branchdale Mine and conduct slag and coal refuse removal activities was entirely dependent upon two lease agreements with the Dale Coal Company (the "Dale Coal Leases"). The second permit is the "White Pine Permit." The Debtors (or one of their affiliates) owned a portion of the land encompassed by the White Pine Permit at the time these cases were filed, and the remainder was owned by the Dale Coal Company (such land hereinafter collectively referred to as the "White Pine Mine"). The Debtors' legal right to conduct mining activities within a portion of the White Pine Mine was dependent upon the Dale Coal Leases (the land covered by the Dale Coal Leases shall hereinafter be referred to as the "Dale Coal Land").

Under state law, the Debtors were required to file bonds for the benefit of the Commonwealth of Pennsylvania to secure their reclamation obligations. *See* 52 PA. CONS. STAT. § 1396.4(d); *See also* 52 PA. CONS. STAT. § 1396.4(a)(2). The Branchdale Mine bond requirement was satisfied by an Irrevocable Standby Letter of Credit issued by Fulton Bank in the amount of $141,498.00 (the "Branchdale Bond"). PA DEP Br. Ex. A, at 1, 17, ECF No. 466. The White Pine Mine bond requirement was satisfied by an Irrevocable Standby Letter of Credit issued by Fulton Bank in the amount of $1,038,528.00 (the "White Pine Bond" and collectively with the Branchdale Bond, the "Fulton Letters of Credit") PA DEP Br. Ex. B, at 1, 15, ECF No. 466.

The Debtors entered into an Asset Purchase Agreement (the "APA") with Rausch Creek on June 1, 2018 for the sale of all its real property (the "Real Property")[4] and substantially all its personal property (the "Personal Property" and collectively with the Real Property, the "Purchased Assets"). APA at 2, 7, ECF No. 107, Ex. A. The sale of the Real Property and Personal Property to Rausch Creek under the APA was subject to higher and better offers. Thus, on July 6, 2018 the Debtors filed a Motion to (a) Approve Sale Procedures and (b) for Authority to Sell by Auction Certain Real Property, Personal Property, Vehicles and Leased Equipment Free and Clear of All Liens, Claims, Encumbrances and Other Interests (the "Auction Motion"). Auction Mot., ECF No. 107. The APA was attached to the Auction Motion and made a part thereof, along with its accompanying schedules. Auction Mot. at 7, ECF No. 107. On July 24, 2018, the Court entered an order granting the Auction Motion with the consent of all parties (the "Auction Order"). Auction Order, ECF No. 152. The Auction Order established August 27, 2018 as the deadline to submit competing bids (the "Bid Deadline") and scheduled a hearing on an anticipated motion to approve auction purchaser pursuant to § 363(f) of the Bankruptcy Code for August 28, 2018 (the "Sale Hearing").

Rausch Creek emerged as the Successful Bidder. Sale Mot. at 3–4, ECF No. 163. On August 27, 2018, the Debtors filed a Motion to Approve Auction Purchaser of Certain Real Property, Personal Property, Vehicles and Leased Equipment Free and Clear of All Liens, Claims, Encumbrances and other Interests and to Approve Distribution (the "Sale Motion"). Sale Mot., ECF No. 163. The Sale Motion proposed sale of the Real Property and Personal Property to Rausch Creek as the Successful Bidder in accordance with the Auction Order. Sale

---

[4] Defined on the Debtor's Schedules and the APA as certain real estate identified as Parcel Nos. 69-012-004, 69-008-049, 69-008-048, 69-008-047, 69-008-042, 69-012-003, 69-008-054 and 69-008-010 all located in Dauphin County and Schuylkill County, Pennsylvania. Schedules A/B Assets at 21, ECF No. 117; APA at 7, ECF No. 107, Ex. A.

Mot. at 4, ECF No. 163. The Sale Motion was presented to the Court without objection and the

Court entered an order approving the Sale Motion on September 4, 2018 (the "Sale Order").

Sale Order, ECF No. 168. It is this Sale Order that Fulton Bank seeks to enforce by the instant

Motion to Compel. To that end, the ensuing language from the Sale Order is important:

> The terms and conditions of the sale as set forth in Debtors' Sale Motion and in the
> Court's Order approving Debtors' Motion to Approve Sale Procedures and for
> Authority to Sell Personal Property Free and Clear of All Liens, Claims
> Encumbrances and Other Interests are incorporated herein. Closing on the sale must
> occur as set forth in the Auction Motion and Sale Motion.

Sale Order at 7, ECF No. 168.

On September 30, 2018, the Dale Coal Company terminated the Dale Coal Lease. Mot.

for Relief at 2, ECF No. 281. Accordingly, the Debtors (specifically, Michael Coal) no longer

possessed a legal right to conduct coal mining activities upon the Dale Coal Land. On October

12, 2018, Rausch Creek met with the PA DEP to informally review an application it had

prepared to transfer the White Pine Permit and a portion of the Branchdale Permit from Michael

Coal to Rausch Creek (the "Initial Application"). Mot. to Compel Hr'g Tr. 130:23–131:10;

132:1-12, ECF No. 458. Rausch Creek did not prepare or submit a separate application for

transfer of the Branchdale Permit because it was "entirely part of and consumed within the"

Initial Application. Mot. to Compel Hr'g Tr. 132:13-16, ECF No. 458. At that meeting, the PA

DEP informally rejected the Initial Application because Rausch Creek could not provide proof of

a legal right to enter upon the Dale Coal Land. Mot. to Compel Hr'g Tr. 133:10-13, ECF No.

458. The Debtors then engaged in negotiations with the Dale Coal Company to secure the right

to enter upon the Dale Coal Land. Mot. to Compel Hr'g Tr. 133:18-22, ECF No. 458. These

negotiations were "ongoing" and unresolved as of the November 30, 2018 closing date under the

Sale Order and APA ("Closing" or, the "Closing Date"). Mot. to Compel Hr'g Tr. 133:18-19, ECF No. 458. Thus, the Initial Application could not be approved by the PA DEP at that time.

Ultimately, the negotiations with Dale Coal Company for access to the Dale Coal Land were unsuccessful. On January 29, 2019, the Dale Coal Company filed a Motion for Relief from the Automatic Stay seeking authority to eject the Debtors from its land. Mot. for Relief at 3, ECF No. 281. Following a hearing on February 26, 2019, the Motion for Relief was granted for cause. Order for Relief, ECF No 333. Shortly thereafter, the Dale Coal Company sent correspondence to the PA DEP advising that Michael Coal no longer had the legal right to enter and perform slag and coal refuse removal at the Branchdale Mine or coal surface mining activities at portions of the White Pine Mine. Consequently, Rausch Creek withdrew all its equipment from the Dale Coal Land in April of 2019 without ever formally applying for transfer of the White Pine or Branchdale Permits. Mot. to Compel Hr'g Tr. 142:21-24, ECF No. 458.

Around the same time, on April 17, 2019, Fulton Bank filed the instant Motion to Compel asserting that the APA and Sale Order required Rausch Creek "to obtain alternative facilities acceptable to [the PA] DEP to secure its obligations under the [Branchdale Permit and the White Pine Permit], after which the Fulton Letters of Credit would be canceled and withdrawn, and Fulton would have no further liability or obligation thereunder." Mot. to Compel at 5, ECF No. 369. In its Motion to Compel, Fulton Bank further alleged that Rausch Creek was "in breach of its obligations under the [APA] and the Sale Order by failing to make a timely application for the transfer of the Branchdale [] Permit and the White Pine [] Permit and by failing to provide replacement security for the Fulton Letters of Credit." Mot. to Compel at 6, ECF No. 369. In its Motion to Compel, Fulton Bank states that:

> [S]ince November 30, 2018, Rausch has conducted business activities and has extracted and sold coal from the Branchdale Mine and the White Pine Mine as if it

6

were the beneficiary and assignee of the Branchdale Mine Permit and the White Pine Mine Permit, when, in fact, Rausch has not even submitted an application of transfer of the permits, let alone have obtained approval of the transfer.

Mot. to Compel at 5, ECF No. 369. Fulton Bank also complains that Rausch Creek:

[H]as not submitted its own security for the permits. Instead, [it] has (i) wrongfully co-opted the benefit of the Letters of Credit issued by Fulton, (ii) unlawfully operated under the security provided by the Letters of Credit and (iii) unjustly enriched itself by its actions, all to the detriment of Fulton." Mot. To Compel at 5-6, ECF No. 369.

Mot. to Compel at 5–6, ECF No. 369. The PA DEP and Rausch Creek filed timely responses to the Motion to Compel. ECF Nos. 380 and 381. Rausch Creek's response to the Motion to Compel flatly denies Fulton Bank's assertion that the APA or the Sale Order "created any obligations for Rausch Creek to replace any letters of credit" until after a permit, or such portion thereof, was transferred. Rausch Creek Answer at 2, ECF No. 381.

On July 8, 2019, Rausch Creek, the Debtors, the PA DEP, and Fulton Bank entered a Stipulation for Entry of Consent Order (the "Stipulation") indicating that the parties had "reached an interim agreement regarding the" Motion to Compel and that they desired "the same to be entered as an order" of the Court. Stipulation 3, ECF No. 411. An order approving the Stipulation was entered on July 9, 2019 (the "Consent Order"). Consent Order, ECF No. 416. Fulton Bank seeks to enforce this Consent Order by the instant Motion for Contempt. To that end, the following language from the Stipulation is important:

Rausch Creek will file an application for a new permit that replaces all areas where Rausch Creek owns both surface and mineral rights within the White Pine Mine/Baby Boy Jarvis Permit, No. 58490102, not later than July 15, 2019 and will prosecute the application diligently.

Stipulation at 3, ECF No. 411.

Six days later, on July 15, 2019, Rausch Creek applied for a new permit covering a diminished area that "included all of the area owned by Rausch Creek following the sale . . . includ[ing] all of the reclamation liability that existed on those sites, and excluded everything that was owned by Dale Coal." Mot. To Compel Hr'g Tr. 143:3-12, ECF No. 458. In other words, the Second Application encompassed the Real Property and the reclamation liability that existed thereon but excluded the Dale Coal Land and the reclamation liability associated therewith. In this 2019 application, Rausch Creek proposed to assume reclamation liability for both the permit boundary area and the bonded area. The Second Application was not acceptable to Fulton Bank because it "did not provide for coverage of all of the lands that are secured by the" Fulton Letters of Credit and would thus leave Fulton Bank "on the hook for some reclamation liability in an undetermined amount [which] . . . wasn't the deal." Stat. Conf. Tr. 8:16-25, ECF No. 448. Stated in the alternative, the Second Application was unacceptable because it excluded the Dale Coal Land and the reclamation liability associated therewith. Realizing that the matter could not be resolved without Court intervention (Stat. Conf. Tr. 15:20-25, ECF No. 448), the parties resigned themselves to conducting discovery and preparing for a hearing on the Motion to Compel. Stat. Conf. Tr. 19:9 –20:14, ECF No. 448.

A hearing on the Motion to Compel and the responses filed thereto was held on January 29, 2020 where testimony was taken, and exhibits were entered into the record (the "Initial Hearing").[5] The central question presented at that time was whether Rausch Creek assumed liability for reclamation of the Real Property and the Dale Coal Land pursuant to the Sale Order or the APA *on the Closing Date*. This Court answered that question in its Prior Opinion. The Court held that "Rausch Creek did not assume liability *at Closing* for reclamation of the land . . .

---

[5] Briefs were also submitted by all parties and additional arguments were heard on April 7, 2020.

pursuant to the terms of the APA . . . [or] the Sale Order or any of its incorporated terms of sale."
*In re Kimmel's Coal & Packaging, Inc.*, 2020 WL 5576960 at *7 (emphasis added). The Court
further held the APA and Sale Order likewise did not "require Rausch Creek to obtain alternative
facilities acceptable to the PA DEP to secure any obligation under the Permits after which the
Fulton Letters of Credit would be canceled and withdrawn and Fulton would have no further
liability or obligation thereunder." *Id.* Shortly thereafter, Rausch Creek withdrew the 2019
application and submitted a new application (the "2020 application"). The representative of the
PA DEP testified that this withdrawal came as a surprise because the 2019 application was very
close to meeting PA DEP's requirements and being finalized with only a few minor corrections
remaining. Tallman Dep. at 28. In the 2020 application, Rausch Creek reduced the bonded area
from approximately 111 acres to only 21 acres. This change to the application prompted the
motions currently before the Court.

## III. Discussion

Before proceeding to the merits of the Motion to Compel, it is important to note a
distinction between the issues presently before the Court and those addressed in the Prior
Decision. The distinction involves liability under the APA for reclamation of the Mines as of the
date of Closing versus ongoing obligations regarding liability for reclamation of the Mines after
Closing. The Court's Prior Decision addressed only the former while specifically reserving the
latter for another time.  Stated more directly, the Prior Decision addressed whether reclamation
liability for the Mines was conveyed to Rausch Creek by the APA *at Closing,* and if not, then
whether the Sale Order (including its incorporated terms of sale) modified the APA such that
reclamation liability was conveyed to Rausch Creek *at Closing. In re Kimmel's Coal &
Packaging, Inc.*, 2020 WL 5576960 at *13. The Court answered both questions in the negative

9

because absent the necessary prior approvals by the PA DEP, the Permits had not been transferred and were not even transferrable *at the time of Closing*.

The issue presently before the Court concerns the extent to which *after closing* Rausch Creek is obligated under the Sale Order or the APA to apply for transfer of the Permits and to pursue liability for reclamation of the Mines, including replacement of the Fulton Letters of Credit. Rausch Creek presently argues that unless the Permits are transferred *in full* and without modification, then it will not be obligated to apply for *any* liability for reclamation of the Mines, including replacement of the Fulton Letters of Credit.[6] Rausch Creek has thus applied for a new permit entirely unrelated to the existing Permits that seeks to mine only a portion of the Mines on the Real Property it purchased from the Debtors without assuming any liability for reclamation of same.[7] This approach represents a departure from Rausch Creek's prior position which acknowledged an obligation to pursue transfer of the Permits and liability for reclamation of the Mines, at least to the extent the Permits were transferable at Closing, and to comply with any obligation under state law to replace the Fulton Letters of Credit as part of that process.[8] Fulton Bank objects to Rausch Creek's current posture and argues that Rausch Creek must seek liability for reclamation of the Mines and replace the Fulton Letters of Credit with its own letters of credit.

The Court now turns to the central question presented here, which is whether Rausch Creek is obligated to apply for transfer of the Permits and pursue liability for reclamation of the Mines and to replace the Fulton Letters of Credit as part of that process.

---

[6] Rausch Creek now claims that it "never agreed to assume the Reclamation Liability and/or replace the Letters of Credit unless the Permits were successfully transferred in full." Rausch Creek Br. in Resp., at 2, ECF No. 559.
[7] The Court will hereinafter refer to the concept of new permits that bear no relation to the Debtors' rights under its existing permits as "Alternate Permits." This is necessary to avoid confusion with 25 PA. CODE § 86.56 which discusses the filing of "an entirely new application" with respect to the permit transfer process.
[8] See section III(B) of this Opinion, *infra*.

10

## A. The Plain Meaning of the APA and Sale Order.

As explained in the Prior Decision, "the Sale Order and its incorporated terms of sale must be construed according to general principles of contract law." *In re Kimmel's Coal & Packaging, Inc.*, 2020 WL 5576960 at *6. The complexities of Pennsylvania law on contract interpretation were explained in the Prior Decision and analyzed in depth by the Third Circuit in *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79 (3d Cir. 2001).[9] Briefly restated here, "[t]he goal of interpreting . . . any . . . contract, is to determine the intent of the parties." *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 163 (3d Cir. 2011).

> Courts assume that a contract's language is chosen carefully and that the parties are mindful of the meaning of the language used. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

*In re Old Summit Mfg.*, LLC, 523 F.3d 134, 137 (3d Cir. 2008) (quoting *Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped*, 886 A.2d 706, 711 (Pa. Cmwlth. 2005)). "[A] contract should be read so as to give meaning to all of its terms when read as an entirety." *Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 169 (3d Cir. 1987). "The meaning of a particular phrase is not properly determined by considering the. . . phrase in isolation but by reading it in harmony with the rest of the contract." *Id.* As a preliminary matter, then, courts interpreting a writing must first determine whether the subject language is clear or ambiguous. *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994).

> A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact.

---

[9] Given the length of the explanation of Pennsylvania law in both, the Court incorporates them here by reference without restating them in full. *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 92–96; *In re Kimmel's Coal & Packaging, Inc.*, 2020 WL 5576960 at *6.

11

*In re Old Summit Mfg.*, LLC, 523 F.3d at 137 (quoting *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 390 (1986)).

With the above principles in mind, and for the following reasons, the Court concludes that the plain language of the Sale Order and the APA unambiguously demonstrates that the parties intended a transfer of the Permits, or the rights granted thereunder, from the Debtors to Rausch Creek as contemplated in the PA DEP Regulations, 25 PA. CODE §§ 1.1 *et seq.* (the "DEP Regulations"), and particularly as set forth in §§ 86.56 and 86.167 thereof.

### 1.    The Sale Order Contemplates a "Transfer" of the Permits.

The Court begins with a review of the Sale Order, and in particular, the Sale Procedures approved and adopted by the Court and incorporated therein. *See* Order Approving Sale, ECF No. 168; Mot. to Approve Sale Proc., ECF No. 107. The Sale Procedures refer to the word "transfer" or some variation thereof no less than 21 times. ECF. No. 107 at ¶¶ 15, 26, 42, 48, and 52. The frequent appearance of this word in its various forms when considered within the context of its use clearly demonstrates the intent of the parties regarding how the rights granted under the Permits were to be conveyed.

For example, the Sale Procedures provide that Rausch, as the Successful Bidder, could "choose which permits it wants **transferred** . . ." and Rausch was to provide a list "of the permits it wants **transferred** to it on or before September 14, 2018." ECF. No. 107 at ¶ 15 (emphases added). The Sale Procedures further provide that the transaction contemplated by the APA was "contingent upon . . . PA DEP **transferring** certain permits . . . for the benefit of Rausch. . . ." *Id.* at ¶ 26 (emphasis added). In addition, the Sale Procedures required all offers to include a list of the Permits "to be **transferred**." *Id.* at ¶ 42 (emphases added). They also imposed a requirement to supply financial guarantees to the PA DEP for all "permits which are

12

to be **transferred** . . . that the Successful Bidder accepts **transfer** of in connection with the purchase . . . upon successful **transfer** of the Permits." *Id.* at ¶ 48 (emphases added). Similarly, the Sale Procedures required the Debtors to use their "best efforts to facilitate a **transfer** . . . of the Permits to the Successful Bidder" and obligated the Successful Bidder to be responsible for any fees necessary "to **transfer** the Permits." *Id.* at ¶ 52 (emphases added). Finally, the Sale Procedures provided that the Permits "may only be **transferred**, as opposed to being assumed and assigned, by the Debtors to a third party subject to approval by the [PA DEP]." Mot. to Approve Sale Proc. at ¶ 15, ECF No. 107 (emphasis added) ("ECF No. 107"). This last provision has additional importance because, for the reasons discussed below, it provides convincing evidence of the parties' intent to make the transaction concerning the permits generally subject to the DEP Regulations and specifically §§ 86.56 (Transfer of permit) and 86.167 (Transfer of permits).

The language of the Sale Order is not ambiguous, defective, obscure, or insensible. Accordingly, the intent of the parties can be determined from the express language of Sale Order itself and there is no need to resort to extrinsic aids or evidence. The Sale Order clearly contemplates a "transfer" of the Permits or the rights granted thereunder. The Court next considers the language of the APA to determine if it likewise contemplates a "transfer" of the Permits.

### 2.    The APA Contemplates a "Transfer" of the Permits.

The Court previously found that the language of the APA contemplates a "transfer" of the Permits. *See In re Kimmel's Coal & Packaging, Inc.*, 2020 WL 5576960, at *8–9 n.17 ("the language of . . . the APA can only be interpreted as providing for transfer of the Permits rather than a sale, assignment, conveyance or other delivery of the Debtors' right, title or other interest

13

under same."). However, because the APA is not a model of clarity in defining the nature of the transaction concerning the Permits,[10] and because the issue presently before the Court is distinct from the issue decided in the Prior Opinion, some additional discussion of the APA is warranted.

Paragraph 2.1 of the APA governs what was being bought and sold.[11] As explained in the Prior Decision, this Court detects no language in Paragraph 2.1 that is reasonably susceptible of differing constructions or that is capable of being understood in more than one sense. As such, the intent of the parties can clearly be determined from the express language of Paragraph 2.1 itself and there is no need to resort to extrinsic aids or evidence. *Id*. The Court concludes that the language of Paragraph 2.1 of the APA contemplates a "transfer" of the Permits, or the rights granted thereunder.[12]

This conclusion is supported by § 8.6 of the APA, which imposes an affirmative obligation upon Rausch Creek to timely apply to transfer the Permits. In this section, the parties agreed that Rausch Creek could "operate under each Permit related to the Businesses after the Closing, as necessary to enable Buyer to conduct the Businesses *while Buyer seeks to replace such Permits with its own Permits (such Permits, the **"Transferable Permits"**)*. APA § 8.6(a), ECF 107, Ex. A (bold and underline in the original, italics added). Section § 8.6 does not pertain to what was bought and sold but refers only to Rausch Creek's obligation to ensure the existing Permits were not deemed abandoned due to non-use while it underwent the application process. Thus, the use of the term "replace" in this section does not define the nature of the sale of the

---

[10] For example, in the asset sale provisions of Section 2.1(c), the APA characterizes the Permits as being "transferable," whereas in other sections the transaction is variously characterized as a "transfer," "replacement," "obtaining," or the "receipt of new" permits. APA §§ 8.6(a)-(c) and 10.2(g). ECF 107, Ex. A.

[11] The Court previously noted that "the language found here describes the only terms and conditions under which the Permits or the liabilities associated therewith could have been sold, transferred, assigned, conveyed or otherwise delivered to Rausch Creek . . . under the APA, if at all." *Id.* at *8.

[12] This also comports with the common-sense nature of a commercial sales transaction. The purchaser (here, Rausch Creek), "transfers" money to the seller (the Debtors) and, in exchange, the seller "transfers" its property and/or rights being sold to the purchaser.

14

Permits, which, as discussed above, is governed by § 2.1 and clearly contemplates a transfer.[13] Also, the use of the word "transferable" within the defined term "Transferable Permits" strongly suggests the parties intended any "replacement" to be a transfer. This is particularly the case when considered in conjunction with the nature of the entire transaction at issue here, which was the sale of the Debtors' mining rights under its Permits. Likewise, because Rausch Creek is obligated to replace the "Permits" with its own "Permits," it seems clear that Rausch Creek was agreeing to obtaining rights identical to those which the Debtors' possessed.[14] In other words, the Permits, or at least the rights granted thereunder, were being "transferred" from the Debtors to Rausch Creek. Also, the next sentence in § 8.6(a) provides:

> Buyer shall promptly after execution of this Agreement prepare and submit the necessary applications (the **"Buyer Applications"**) to the applicable Government Body, to obtain the Permits required to operate the Business.

APA § 8.6(a) ECF 107, Ex. A (bold and underline in the original). This language contemplates that Rausch will obtain the "Permits" as defined in § 5.11(a) of the APA, which are the very permits used by the Debtors to carry on mining activity "as currently conducted." Also, and just like the language found in the Sale Order, the language quoted here referencing application "to the applicable Government Body" has additional importance because it demonstrates the parties' express intent to make the transaction concerning the permits subject to applicable DEP Regulations.

---

[13] To conclude otherwise would violate the harmonious-reading and surplusage cannons. Under the harmonious-reading canon, the provisions of a contract should be interpreted in a way that renders them compatible, not contradictory. *See United States v. Bass*, 404 U.S. 336, 344, 92 S. Ct. 515, 30 L.Ed.2d 488 (1971). Also, under the surplusage cannon, a contract is to be read as a whole in order not to render portions of it superfluous or meaningless. *Sloan & Co. v. Liberty Mut. Ins. Co.*, 653 F.3d 175, 181 (3d Cir. 2011) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988). To adopt any other position here would unnecessarily place the language of § 2.1 in direct conflict with the language of § 8.6 or, alternatively, render one of the provisions entirely superfluous.

[14] This is because the term "Permits" is a defined term under the APA and means the mining business "as currently conducted" by the Debtors. APA § 5.11(a) ECF 107, Ex. A.

15

For the foregoing reasons, the Court finds that both the Sale Order and the APA contemplated a "transfer" of the Permits from the Debtors to Rausch Creek. Accordingly, Rausch Creek was not permitted to seek Alternate Permits, but was obliged to apply for a transfer of the Permits.

**B.      Rausch Creek's Duties to Seek a Transfer Under the Sale Order and APA.**

Having established that the Sale Order and APA required Rausch Creek to apply for the transfer of the Permits and not to seek Alternate Permits, the Court now addresses Rausch Creek's argument that it had no obligation to apply to transfer the Permits because mining permits can only be transferred in their entirety and not in part. Rausch Creek contends that it is under no obligation to apply for the Permits or to assume the liability for reclamation of the Mines or replace the bonds because the Permits cannot legally be transferred in full due to the inability to secure the right to enter upon the Dale Coal Land. For the following reasons, the Court rejects this argument.

As a threshold matter, Rausch Creek previously assumed a position in this proceeding that directly contradicts the position it advances here. To the extent that it prevailed in maintaining that position,[15] the doctrine of judicial estoppel prohibits Rausch Creek from assuming its present contradictory position.[16] Consider the language chosen by Rausch Creek in

---

[15] *See In re Kimmel's Coal & Packaging, Inc.*, 2020 WL 5576960, at *9 (Finding that "Rausch Creek did not assume liability at Closing for reclamation of the land associated with the [Permits] pursuant to the terms of the APA" while simultaneously recognizing that the 2019 Application submitted by Rausch Creek, which proposed assumption of liability for reclamation of the land covered by the application, had likely already been approved).

[16] It is well settled that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749, (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). This rule, known as judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Id.* (citing *Pegram v. Herdrich*, 530 U.S. 211, 227, n.8 (2000)). The Supreme Court of the United States has recognized that the purpose of judicial estoppel is "to protect the integrity of the judicial process," by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* (quoting *Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 598 (6th Cir. 1982) and *United States v. McCaskey,* 9 F.3d 368, 378 (5th Cir. 1993)).

response to the Motion to Compel affirming that it "will provide replacement collateral for *such portion* of the mining permits transferred to Rausch Creek under the [APA] and Sale Order and the replacement collateral requested by the PA DEP." Rausch Creek Answer at 2, ECF No. 381 (emphasis added). Rausch Creek also declared that there is "no time requirement under the [APA] or the Sale Order for Rausch Creek to facilitate a request for the transfer of the Branchdale Mine Permit or the White Pine Permit, *or such portions thereof*, and such time period is at the complete discretion of Rausch Creek." Rausch Creek Answer at 3, ECF No. 381 (emphasis added). Rausch Creek similarly avowed to "post its own collateral once *a portion of the* Branchdale Mine Permit and White Pine Permit are transferred and in such amount as requested by the PA DEP." Rausch Creek Answer at 3, ECF No. 381 (emphasis added). Likewise, and in defense of the claim that it had improperly "utilized" the Fulton Letters of Credit, Rauch Creek stated that "[t]he 'utilization' prohibition in paragraph 48 of the Auction Motion only applies after a mining permit is transferred and does not prohibit Rausch Creek from being a contract operator for the Debtors until *such portions* of the Branchdale Mine Permit and White Pine Permit are transferred." Rausch Creek Answer at 3, ECF No. 381 (emphasis added). Similarly, in its response to the Motion to Compel, Rausch Creek admitted that "a request for *a portion of the* Branchdale Mine Permit and the White Pine Permit have not been submitted yet." Rausch Creek Answer at 4, ECF No. 381 (emphasis added).

Moreover, Rausch Creek offers no legal authority among the statutes, regulations, or caselaw for its contention that a permit may only be transferred in full. The Court has not located any such statute, regulation, or caselaw supporting Rausch Creek's contention. Importantly, the Court does not read anything in PA. CODE § 86.56 or other provisions of the DEP Regulations that precludes a "transfer, assignment, or sale" of a portion of the rights under a permit.

17

Generally, when a right that is subject to transfer, assignment, or sale is possessed, controlled, or owned in full, as is the case here, the possessor, controller, or owner of such right can transfer, assign, or sell that right in full or in part.

Additionally, the plain language of §§ 2.1, 5.11(a) and 10.2 of the APA refutes Rausch Creek's claim that the transaction as contemplated by the parties was an "all or nothing" deal. Under § 2.1, the Permits being purchased by Rausch Creek were "as the same shall exist on the Closing Date." Likewise, under § 5.11(a), the defined term "Permits" means approvals necessary to "carry on the [business of mining and related activities] as currently conducted." This language plainly contemplates that the Permits, or the rights granted thereunder, may be transferred in full or in part depending upon the degree to which the Debtors were authorized to conduct the business of mining or related activities as of the Closing Date. As such, the plain language of §§ 2.1, 5.11(a) and 10.2 of the APA refutes Rausch Creek's claim that the transaction as contemplated by the parties was not an "all or nothing" deal.

Moreover, the APA provides that "subject to the conditions of this Agreement" the Debtors are required to sell and Rausch Creek is required to purchase. . . .

> (c)     *To the extent transferrable* to Buyer, all Permits . . . and other authorizations of any Governmental Body owned, held or used by Sellers, in or related to the . . . operation of the Businesses.

APA § 2.1, ECF 107, Ex. A (emphasis added).[17] To sustain its position, Rausch Creek appears to interpret the phrase "to the extent transferrable" to mean that the Permits cannot be transferred at all unless they are transferrable in their entirety. This argument is contrary to the plain meaning of the phrase "to the extent transferrable" as it appears in § 2.1 of the APA.

---

[17] Section 10.2(g) similarly provides that "Buyer shall have obtained all Permits required to operate the Businesses, either by transfer of Sellers' Transferable Permits *to the extent permitted by* law or by Buyer's receipt of new Permits." APA § 10.2(g), ECF 107, Ex. A (emphasis added).

Initially, the Court notes that the word "extent" is nontechnical in nature and ordinarily means "the range (as of inclusiveness or application)," or "the point or degree to which something extends."[18] Restating § 2.1(c) of the APA with this meaning yields the following:

> (c)     *To the _point or degree_ transferrable* to Buyer, all Permits . . . and other authorizations of any Governmental Body owned, held or used by Sellers, in or related to the . . . operation of the Businesses.

Clearly, then, the phrase "to the extent transferrable" as it originally appears in § 2.1(c) of the APA modifies Rausch Creek's obligation (to apply for and accept transfer of the Permits) to the *point or degree* to which the law will allow. Stated otherwise, Rausch must apply for and accept the transfer of as much of the Permits as it can under § 2.1 of the APA, even if that is some portion less than 100%.

The Court finds further support for this conclusion in the Supreme Court decision of *Cohen v. de la Cruz*, 523 U.S. 213, 217–18, 118 S. Ct. 1212, 1216, 140 L. Ed. 2d 341 (1998) (emphasis added), wherein the Supreme Court analyzed a similar phrase in the context of 11 U.S.C. § 523(a)(2)(A), which excepts from discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, **to the extent** obtained by . . . false pretenses, a false representation, or actual fraud." In its analysis, the Supreme Court opined that this "phrase . . . makes clear that **the share of** money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt." *Id.* at 218 (emphasis added). Thus, the phrase "to the extent" has been interpreted by the Supreme Court as limiting the subject to something potentially less than 100% of the whole. In the context of § 523(a)(2)(A), that means that not all money is excepted from discharge, but only that share that is related to fraud. In *In re Menell*, 37

---

[18] *Extent*, <u>Merriam-Webster's Collegiate Dictionary,</u> https://www merriam-webster.com/dictionary/extent.

F.3d 113, 115 (3d Cir. 1994) (emphasis added), the Third Circuit also interpreted the phrase "to the extent" as it then appeared in 11 U.S.C. § 522(f), which provided in part that:

> Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property *to the extent* that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—
>
> (1) a judicial lien; ...

Like the Supreme Court, the Third Circuit in *Menell* affirmed that the phrase "to the extent" should be read in a proportionate manner and thus did not permit avoidance of the entirety of a lien, but only that portion impairing the homestead exemption. *Id.* Similarly, in interpreting the phrase "to the extent" in an indemnification provision of an insurance contract,[19] the Third Circuit stated that "[t]he expression 'to the extent' means specifically that Conrail should be indemnified in an amount equivalent to the proportion PTL's acts bear to the whole of the acts or omissions that caused Clement's death." *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 602 (3d Cir. 1992). Applying these definitions to the phrase "to the extent" as it appears in the present matter, Rausch Creek is required to apply for and accept transfer of that share, or proportion, of the Permits that it can, even if that is something less than 100%.

This conclusion is also consistent with Rausch Creek's conditions for closing set forth in § 10.2(g) of the APA which required that it "shall have obtained all Permits required to operate the Businesses, either by transfer of Seller's Transferable Permits *to the extent permitted by law*." Under this provision, and again incorporating the ordinary meaning of the word "extent" as it appears therein, it was specifically contemplated that some portion of the Permits might not be obtained. For the foregoing reasons, the Court finds that, under the plain terms of the parties'

---

[19] The contract required PTL to indemnify Conrail for injury or death "to the extent such event shall have arisen from any act of commission or omission, negligent or otherwise, of [PTL], or of any of [PTL's] agents, servants, or employees." *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 601 (3d Cir. 1992).

agreement, Rausch Creek was contractually obligated to obtain whatever portion of the Permits that it could.[20] The final issue, therefore, is whether the application encompasses a concomitant obligation to accept reclamation liability and post the requisite bonds.

### C. The Parties Contemplated that the "Transfer" Would Occur in Accordance with State Law.

The APA and Sale Order cannot be read in a vacuum but must be read in conjunction with applicable state law governing the transfer of mining permits as specifically contemplated by the parties. As previously noted, the APA and Sale Order clearly recognize the necessity of governmental authorization to approve any transaction concerning the subject Permits.[21] Indeed, by signing the APA, Rausch Creek expressly recognized that it would have to "prepare and submit the necessary applications . . . to the applicable Governmental Body, to obtain the Permits required to operate the Business." APA § 8.6(a), ECF 107, Ex. A. Thus, the interplay between the APA and Pennsylvania law was clearly understood and recognized by the parties throughout this process.

State law is significant because, regardless of whatever terms the parties may have used in the APA to describe the nature of the transaction,[22] the DEP Regulations provide for the *only*

---

[20] The Court is not deciding whether a permit can be transferred in part. The Court only holds that under the Sale Order and APA Rausch Creek is obligated to submit an application pursuant to § 86.56 seeking transfer of the Permits or as much of them as is possible. Whether any such transfer ultimately is approved is within the purview of the PA DEP and subject to applicable state law.

[21] In addition to the preceding sections of this Opinion, *see also* Docket No. 107, at ¶ 15 ("Permits "may only be transferred, as opposed to being assumed and assigned, by the Debtors to a third party **subject to approval by the" PA DEP**; ), ¶ 26 ("contingent upon . . . **PADEP** transferring certain permits . . . for the benefit of Rausch. . . ."), ¶ 48 ("The Successful Bidder understands that it will need to provide its own financial guarantee to **PADEP** upon successful transfer of the Permits"); ¶52 ("The Successful Bidder shall be responsible for any fees charged by the **PADEP, or any other governmental agency**, to transfer the Permits") (emphases added); APA § 2.1(c) (selling "all Permits . . . and other **authorizations of any Governmental Body** owned, held or used by Sellers" in conducting mining activity), § 5.11(a)(emphasis added) (defining "Permits" to mean all "permits . . . and other **authorizations . . . from a Governmental Body** that are necessary to entitle Sellers" to conduct their current mining activity); § 8.6 (Rausch agreed to "submit the necessary applications (the **'Buyer Applications')** to **the applicable Government Body**, to obtain the Permits required to operate the Business.") (emphases added).

[22] *See* n.11, *supra*.

21

means by which the rights under a mining permit can be conveyed from one party to another. *See* 25 PA. CODE §§ 1.1 *et seq*. These regulations also govern the concomitant reclamation and bonding duties and obligations in transferring a permit. Specifically, § 86.56 (Transfer of permit) provides that "[a] transfer, assignment or sale of the rights granted under a permit may not be made except as provided in this section." 25 PA. CODE § 86.56(a).[23] The regulation further provides that the PA DEP "may allow a permittee to transfer a permit to another operator," but only if the successor operator meets the conditions specified therein. 25 PA. CODE § 86.56(c). This language is clear and unambiguous. Thus, Rausch Creek could only obtain Debtors' rights under the Permits by complying with § 86.56.

Section 86.56 provides that the PA DEP may allow a permittee to transfer a permit, or the rights granted thereunder to another, but only if the transferee:

> (1) Is not in violation of the acts, the regulations adopted thereunder or the terms and conditions of permits issued thereunder[;]

> (2) Assumes the liability for reclamation, water pollution, planting and other responsibilities under the law, the rules and regulations and the terms and conditions of the permits from the date of original issuance of the permits[; and]

> (3) Has submitted an entirely new application, supporting documentation and complied with public notice requirements of this chapter; or if the successor operator does not wish to submit an entirely new application, the Department will accept an application which incorporates the original application submittals.[24]

---

[23] The Court previously concluded that the language of § 86.56 of the DEP Regulations controls the transfer of any mining permit or the rights granted thereunder. *See In re Kimmel's Coal & Packaging, Inc.*, 2020 WL 5576960, at *9 n.17 ("It has already been established that the rights granted under a permit may not be separately sold, assigned, conveyed or delivered to another, except through a transfer of the actual permit by application approved by the PA DEP. 25 PA. CODE § 86.56.").

[24] The regulation continues here by providing:
> In such a case the successor operator shall expressly agree to abide by permit conditions, comply with the public participation requirements of this chapter, assume the responsibility for violations which may occur on the area previously affected, and shall furnish the Department with the following:
>> (i) The identity of the applicant as required in § 86.62 (relating to identification of interests), and the compliance information as required in § 86.63 (relating to compliance information).
>> (ii) A property map showing the extent to which the mining has been completed under the existing permit.
>> (iii) The name and address of the existing permittee.

22

25 Pᴀ. Cᴏᴅᴇ § 86.56(c)(1), (2), and (3). Also relevant here is § 86.167 (Transfer of permits) of

the DEP Regulations which provides:

> Before a permit is transferred as provided in Subchapter B (relating to permits), the successor operator shall post a new bond in an appropriate amount determined by the Department under this subchapter but in no case less than the amount of bond on deposit with the Department, in the successor operator's name, assuming all accrued liability for the permit area.

25 Pᴀ. Cᴏᴅᴇ § 86.167.

The language of §§ 86.56 (Transfer of permit) and 86.167 (Transfer of permits) is plain

and unambiguous. Section 86.56(c) grounds the lawful transfer of a permit, or the rights granted

thereunder, upon the submission of "an entirely new application [with] supporting

documentation" in compliance with the public notice requirements of the DEP Regulations.

Alternatively, if the successor operator does not wish to submit an entirely new application, the

PA DEP will accept an application which incorporates the original application submittals, but

only if the transferee also abides by additional conditions expressly set forth in § 86.56(c)(3). In

either case, § 86.56(c) requires the transferee to "assume[] the liability for reclamation, water

pollution, planting and other responsibilities under the law, the rules and regulations and the

terms and conditions of the permits from the date of original issuance of the permits."

According to the plain language of § 86.56(c), then, the transferee of a transfer of a mining

permit, or the rights granted thereunder, is obligated to submit an application in compliance with

the provisions of § 86.56 and to assume the liability for reclamation of the land associated with

---

    (iv)  Appropriate bond in the amount specified by the Department in accordance with Subchapter F (relating to bonding and insurance requirements).

    (v)  Proof of public notice as required by § 86.31 (relating to public notices of filing of permit applications).

    (vi)  Additional information that will enable the Department to determine that the applicant is able to operate the mine in such a manner as to prevent pollution to waters of this Commonwealth.

25 Pᴀ. Cᴏᴅᴇ § 86.56(c)(3)(i)-(vi).

such permit at the time of the transfer. In a similar manner, § 86.167 unquestionably requires the transferee of a permit (or the rights granted thereunder) to post a new bond in the transferee's name and in an amount "no . . . less than the amount of bond on deposit with the Department" before a permit is transferred as provided in § 86.56.

Thus, because the Court has already concluded the parties intended for the transfer to occur as provided in § 86.56 of the DEP Regulations and because § 86.56 unambiguously obligates the transferee of any such transfer to submit an application in compliance therewith and to assume the liability for reclamation of the land associated with the permit at the time of the transfer, this Court concludes that the parties contemplated that Rausch Creek, as the successful bidder and Buyer under the APA, would submit an application to the PA DEP fulfilling these requirements.[25] Further, because § 86.167 incontrovertibly requires the transferee of a permit (or the rights granted thereunder) to post a new bond in its name and in an amount no less than the amount of bond on deposit with the PA DEP at the time of transfer, it follows that the parties contemplated that Rausch Creek, if the application referenced above was ultimately approved by the PA DEP, would have to fulfill this requirement as well.

For the reasons set forth above, the Court finds that under the plain terms of the Sale Order and the APA and the interplay with state law, the parties agreed that Rausch Creek would apply for transfer of as much of the Permits as it could in accordance with § 86.56 and that any such application, if approved, would require Rausch Creek to assume liability for reclamation of the land commensurate thereto and to post a new bond in its name and in an amount no less than the amount of the Fulton Letters of Credit at the time of transfer.

---

[25] Indeed, when read in conjunction with the language of § 8.6 of the APA, Rausch Creek must do so "promptly" after execution of the APA.

**D. Even If the APA is Deemed Ambiguous, the Extrinsic Evidence Demonstrates Rausch Creek Was Obligated to Apply for as Much of the White Pine Permit as it Could, Assume Reclamation Liability, and Post its Own Bonds.**

Even if the APA is deemed ambiguous, the extrinsic evidence only bolsters the Court's conclusion above. This is based on the following credible findings of fact and reasoning, which includes the language of the agreement, the parties' representations to the Court, and the parties' conduct.

First, in reviewing the proposed sale, the Court considered several salient factors consistent with its duty to act in furtherance of the diverse interests of the Debtors, the estate, creditors, and equity holders alike. Among those factors was concern regarding the potential for a large administrative claim for reclamation liability which would leave little, if any, money for the general unsecured creditors. Mot. for Contempt Hr'g Tr. of Jan, 29, 2019, at 12, 17, ECF No. 538. In that regard, at the August 28, 2021 hearing on the Motion to Approve Sale Procedures and for Authority to Sell by Auction Certain Real Property, counsel for the Debtors expressly averred that "[t]hat's one of the important reasons to do this sale to be honest with you, Your Honor, because there's huge requirements of land reclamation if the business were to close." Sale Hearing at 10:30:27. Based upon this and other considerations, the Sale Order found that the relief sought in the Motion for Sale was "in the best interests of the Debtors' bankruptcy estate and the creditors thereof." Sale Order at 2–3, ECF. No. 168. The Court would not have approved the sale if it granted Rausch Creek the Debtors' mining rights but did not also include reclamation liability that would reduce the possibility of a large administrative claim.[26]

---

[26] Throughout these proceedings everyone, including Rausch Creek, the PA DEP, and the Court believed and understood the Permits would be transferred to Rausch Creek and that the administrative claim of the PA DEP, if any, would be eliminated or reduced as a result. Mot. for Contempt Hr'g Tr. of Jan. 29, 2019, at 10, 12, 17–18, ECF No. 538. Counsel for the Debtor represented to the Court the importance of transferring the White Pine Permit to reduce the reclamation liability on the estate. *Id.* at 17–18.

25

Second, Rausch Creek was permitted to choose which permits it wanted transferred on or before September 14, 2018, which was before the Closing. Despite knowing that there was an outstanding issue with the Dale Coal Land, Rausch Creek nevertheless selected the White Pine and Branchdale Permits as evidenced by the Initial Application and proceeded to Closing. ECF No. 107, ¶¶ 15, 26. Rausch Creek thus selected the Permits with full knowledge that it might not be able to mine all the land encompassed by those Permits. When Rausch Creek selected these Permits, it did not advise of any condition even suggesting that it was an "all or nothing" deal. Rather, it went forward knowing that, at that time, it did not have access to all the land associated with the Permits.

Third, after the Sale was approved, Rausch Creek acted in a manner consistent with the understanding it would assume the reclamation liability associated with the Permits. Rausch Creek's informal 2018 application for the Permits included the reclamation liability, evidencing its intention to be responsible therefor. Dep. T. Schmidt, Aug. 27, 2020, at 40. This is strong evidence of Rausch Creek's own understanding that it was responsible for such liability. Rausch Creek also acted in a manner consistent with the understanding it would assume the reclamation liability associated with each of the other three mining permits it purchased under the APA. In each of those other three permit applications submitted by Rausch Creek pursuant to the APA and accepted by PA DEP, Rausch Creek provided its own security for reclamation liability. Mot. to Compel Hr'g Tr. 94:13-14, ECF No. 458; Tr. Schmidt, 8/27/20, at 5–7; Tallman 8/28/20, at 30–32. Again, this demonstrates Rausch Creek's understanding that it would have reclamation liability for the Permits at issue here. Further, Rausch Creek's initial use of the reclamation section from the original permit transfer applications is consistent with the transfer requirements under state law and with Rausch Creek's admission that it is cheaper and easier to transfer a

26

mining permit than create a new one, which again supports the conclusion that transfer inclusive of reclamation liability was its intention all along. Rausch Creek Br. in Resp., at 7, ECF. No. 559. Rausch Creek also represented to the Court on the record, through counsel, that "once the permits are transferred, *which we suspect they will be, the reclamation liability for the debtor is taken over by Rausch Creek* or the Rausch Creek related entities, *which will reduce any proof of claim or administrative claim that the DEP might have against the estate*." Mot. for Contempt Hr'g Tr. of Jan, 29, 2019, 10:9-14, ECF No. 538 (emphasis added). Rausch Creek routinely behaved in a manner consistent with this statement throughout these proceedings. This evidences Rausch Creek's own understanding that the Permits would be transferred inclusive of reclamation liability.

Fourth, the language adopted by Rausch Creek in the Stipulation for Entry of Consent Order (the "Stipulation") it entered with the Debtors, the PA DEP, and Fulton Bank on July 8, 2019, contains the following language:

> Rausch Creek will file an application for a new permit that replaces all areas where Rausch Creek owns both surface and mineral rights within the White Pine Mine/Baby Boy Jarvis Permit, No. 58490102, not later than July 15, 2019 and will prosecute the application diligently.

Stipulation 3, ECF No. 411. Consistent with its representations in the Stipulation above, Rausch Creek did timely submit an application to the PA DEP in compliance with § 86.56 of the DEP Regulations seeking transfer of *a portion of* the Permits from the Debtor to Rausch Creek (the "2019 Application"). The 2019 Application covered a portion of the Mines that "included all of the area that was owned by Rausch Creek following the sale . . . includ[ing] all of the reclamation liability that existed on those sites, and excluded everything that was owned by Dale Coal." Mot. To Compel Hr'g Tr. 143:3-12, ECF No. 458. In other words, the 2019 Application submitted by Rausch Creek sought transfer of only *a portion* of the Permits rather than seeking

transfer of the Permits *in full*. It also provided for assumption of the liability for reclamation of the portion of the Mines transferred to Rausch Creek from the Debtor as contemplated by § 86.56. In short, the 2019 Application did everything that Rausch Creek now claims cannot be done under the DEP Regulations.

As an aside, the Court finds it curious that the 2019 Application was unexpectedly withdrawn by Rausch Creek shortly after this Court issued its Prior Opinion.[27] During the hearing on the Motion for Contempt, a representative of the PA DEP testified that he was surprised when Rausch Creek withdrew the 2019 Application because it was very close to being approved subject to some minor "technical deficiencies" and "paper corrections," that needed to be taken care of. Mot. for Contempt, ECF No. 494, Ex. E. Counsel for the PA DEP similarly represented to the Court that the PA DEP was surprised that the application was withdrawn because it "was very close to being finalized and meeting the Department's requirements." Hearing, ECF No. 571, at 14. This evidence strongly suggests that the PA DEP would have approved a transfer of a portion of the Permits, or the rights granted thereunder, notwithstanding Rausch Creek's current argument such a transfer is not possible.[28]

Finally, Rausch Creek argues that the "plain language of the Stipulation required Rausch Creek to file a new mining permit application" and that "[s]ince the 2019 Application was a <u>new</u> mining permit there was no legal duty for Rausch Creek to assume any reclamation liability as there is with a <u>transfer</u> of an already existing mining permit." Rausch Creek Br. in Resp., at 4, ECF No 559. The Court rejects this argument. As discussed above, under the applicable statutory

---

[27] Rausch Creek claims that it withdrew the 2019 Application because it unintentionally included an assumption of liability for reclamation of the Mines. As such, it was necessary to withdraw the application due to this "administrative error." The Court does not find this explanation to be credible in view of significant evidence to the contrary. It seems more likely that Rausch Creek withdrew the 2019 Application shortly after issuance of the Prior Opinion and submitted the 2020 Application assuming its current position so that it could obtain the rights granted under the Permits without assuming the attendant reclamation liability.

[28] *See* n. 20, *supra.*

scheme, a transfer can include "an entirely new application." 25 PA. CODE § 86.56. Thus, Rausch Creek's interpretation does not necessarily flow from the applicable regulatory scheme. Further, the Stipulation required Rausch Creek to submit "an application for a new permit that replaces all areas where Rausch Creek owns both surface and mineral rights within the White Pine/Baby Boy Jarvis Permit. . . ." The primary issue of dispute giving rise to the Stipulation concerned the reclamation liability for a portion of the land covered by the White Pine Permit. It strains credulity to believe that, while the parties were fighting over that very issue, they simultaneously agreed to allow Rausch Creek to use a permitting process that would avoid any existing reclamation liability.[29] Moreover, this Court would not have approved (and the trustee likely would have objected to) the Stipulation had it been based on an understanding that Rausch Creek could avoid existing reclamation liability, leaving the estate subject to a large administrative claim by the PA DEP. Additionally, for all the reasons set forth above, the Court cannot conclude that the "new permit" contemplated in the Stipulation means one unrelated to the existing Permit. Such a conclusion would make no sense because Rausch Creek would not need anyone's permission to obtain Alternate Permits for the White Pine Mine and it would undermine the very purpose of the sale. In any event, by Rausch Creek's own admission, the Stipulation was an "interim" agreement and the parties all reserved their rights to litigate the respective obligations under the Sale Order and APA.

E. **Rausch Creek Did Not Disobey an Order of the Court.**

The Court finds that while Rausch Creek engaged in legal machinations in an attempt to limit its reclamation liability, its repeated efforts to formally and informally apply for permits in

---

[29] Rausch Creek acknowledges that "[t]he intent of the Stipulation was to speed up the permitting process and not to resolve the parties [sic] dispute that was heading for trial." Rausch Creek Br. in Resp. at 3, ECF No. 559.

2018, 2019, and 2020 do not demonstrate that it disobeyed any Court order. Accordingly, the motion for contempt is denied.

**F.     The Motion for Damages is Denied Without Prejudice.**

Fulton Bank seeks damages for Rausch Creek's alleged "use" of its Letters of Credit. Fulton Bank argues that Rausch Creek is responsible for reclamation liability at a portion of the Real Property known as the "Primrose Pit" for all its mining activity from September 2018 through April 2019. The Court finds that this issue is not ripe for adjudication because there is presently no claim against the Letters of Credit. Until that occurs, Fulton Bank cannot demonstrate the requisite injury required for adjudication. Accordingly, the motion for damages is denied without prejudice.

## IV.     Conclusion

For the foregoing reasons, the Motion to Compel is granted in part, the Motion for Contempt is denied, and the request for damages is denied without prejudice. An appropriate order will follow.

Dated:  September 28, 2021          By the Court,

Henry W. Van Eck, Chief Bankruptcy Judge (MS)

30